J-E02003-16

2017 PA Super 150

| | |
|---|---|
| CHRISTOPHER GUTTERIDGE AND APPLIED ENERGY PARTNERS, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| J3 ENERGY GROUP, INC., T/D/B/A J3 ENERGY GROUP AND STEPHEN RUSSIAL | |
| Appellants | No. 3397 EDA 2013 |

Appeal from the Judgment Entered November 25, 2013
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2009-09160-CA

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E.,
         BOWES, J., PANELLA, J., SHOGAN, J., LAZARUS, J., OLSON, J.,
         and OTT, J.

OPINION BY LAZARUS, J.:                          **FILED MAY 17, 2017**

J3 Energy Group, Inc. (J3) and Stephen Russial (Russial) (collectively

Appellants/Defendants) appeal from the judgment entered in the Court of

Common Pleas of Chester County in favor of Christopher Gutteridge

(Gutteridge) and Applied Energy Partners, LLC (AEP) (collectively

Appellees/Plaintiffs), in the amount of $343,887.00.  After careful review, we

affirm.[1]

---

[1] Appellant/Defendant J3 filed a motion to withdraw the appeal as to J3 only, averring J3 is now "under common ownership with Plaintiff/Appellee [AEP]." We grant J3's motion to withdraw the appeal.  **See** Pa.R.A.P. 1973. Additionally, Appellees/Plaintiffs have filed a motion to strike portions of Appellants'/Defendants' brief.  We deny this motion.

The underlying facts of the case are as follows.  In 2004, Gutteridge formed AEP, which sold electronic motor controls and energy saving lighting products to commercial and industrial customers.  AEP conducted its business through approximately fifteen sales agents known as channel partners.  Channel partners who had their own businesses would buy products from AEP at discounted prices and sell them to their customers at higher prices.  Channel partners who did not have their own businesses were paid a commission by AEP for the sales they generated.

The case before us arises out of business dealings between AEP and J3.  Gutteridge formed AEP in 2004, and Russial founded J3, a corporation, in 2002.  J3 provides energy procurement[2] and demand response services[3] to commercial and industrial clients.

---

[2] At trial, Gutteridge defined "procurement" as follows:

> The business of helping the end-user consumer buy their electricity or natural gas most advantageously.  Ten or 15 years ago all utilities were fully regulated and you had no choice.  Over the last ten or 15 years various states have become deregulated, so now end[-]user consumers can buy their own electricity from ten to 15 different potential suppliers.

N.T. Trial, 6/12/12, at 31.

[3] At trial, Gutteridge defined "demand response" as follows:

> The business where a utility will pay a large electrical user to curtail their usage on days when the electrical grid has a high load, which are nearly always summer afternoons.  If the load on the grid gets too high, they send out a message.  And those people who have signed up for demand response, and who will

*(Footnote Continued Next Page)*

Gutteridge and Russial met in 2007; in March 2008, they developed a plan whereby AEP would use its channel partners to provide J3's services to its customers. They discussed forming a joint venture called the Energy Buyers Group (the Group); the Group's members would benefit from lower electric supply costs that the Group would negotiate for them. Gutteridge, through AEP, had a sales network that called upon manufacturers, which Russial did not have, and Russial had technical knowledge and expertise within the energy procurement industry, which Gutteridge did not have. *See* N.T. Trial, 6/12/12, at 36, 44.

Gutteridge and Russial agreed that they would divide the revenue generated by the Group as follows: 60% to J3 and 40% to AEP. However, in the beginning, the revenue would be divided 65% to J3 and 35% to AEP because J3 would be heavily involved in closing the sales, while the AEP channel partners were learning about energy procurement and demand response services. Additionally, AEP would pay the channel partners 20% of the total revenue, and retain a net commission of 15%.

At an AEP meeting in January 2008, Gutteridge introduced the channel partners to Russial and J3. At training sessions in January and May 2008, the Group concept was discussed, and Russial explained how J3's services

*(Footnote Continued)* _____

be paid for doing it, agree to curtail their use during those periods.
*Id.* at 30.

worked and how to sell them. Only two of the channel partners, Lori Porreca (owner of A1 Restoration, Inc., and A1 Energy, Inc.) and Herb Keaton (owner of Plastic Machinery Sales), sold the Group's services; they were the sole channel partners with customers in the PPL[4] utility area, which was scheduled to become deregulated in January 2010.[5]

At the initial meetings in 2008, Russial told the channel partners that it was important for the Group to reach 50 megawatts of purchasing volume because that was the amount needed to secure optimum pricing from energy suppliers. On February 25, 2009, Russial sent an email confirming that the Group had reached this threshold.

Although Gutteridge maintained that he and AEP made significant efforts to market the Group, Russial became dissatisfied with AEP's performance with respect to AEP's efforts to develop and train a sales force to market J3's energy services. On March 9, 2009, Russial sent Gutteridge an email setting forth a proposal that J3 compensate A1 Restoration, Plastic Machinery Sales and AEP channel partner Mark Burton directly for any sales they close. Under the new proposal, J3 would pay AEP a 10% or 20% referral fee for any sales generated by channel partners other than Porreca,

---

[4] PPL, formerly known as PP&L, or Pennsylvania Power and Light, is an energy company headquartered in Allentown, Pennsylvania.

[5] The other large utilities in Pennsylvania, PECO and MetEd, were scheduled to deregulate in January 2011.

Keaton or Burton, depending on the extent of Appellants'/Defendants' involvement. This referral fee was less than the share being paid to AEP under the existing arrangement. The proposal also included a requirement that AEP sign a non-compete agreement for any existing or new clients of the Group.

On April 21, 2009, Russial sent an email to Gutteridge informing him that Russial would not make any payments to AEP from J3 unless Appellees/Plaintiffs agreed to sign a document prepared by Russial that would include a non-compete clause for any customers secured by Porreca, Keaton or Burton. AEP never signed a new agreement with J3, and J3 never paid AEP for any of the revenues generated from the Group joint venture.

Appellants/Defendants voluntarily paid channel partners Porreca and Keaton directly for their services, rather than Appellees/Plaintiffs. They also had Porreca and Keaton sign non-compete agreements, which caused Appellees/Plaintiffs to lose two key channel partners, and resulted in the customers Porreca and Keaton had obtained for the Group becoming direct customers of J3. Despite the fact that the parties manifested intentions to ultimately reach an agreement to form Energy Buyers Group and then market that entity to prospective clients for the sale of energy procurement and demand response services, Russial unilaterally transformed the relationship in order to develop a direct association with the most committed AEP channel partners, Porreca and Keaton.

Gutteridge and AEP commenced this action against Russial and J3 by filing a writ of summons on August 14, 2009. They filed a complaint on May 10, 2010, raising several counts against Appellees/Defendants, including promissory estoppel, breach of contract, unjust enrichment, breach of implied duty of good faith and tortious interference with contractual rights. Following a four-day non-jury trial before the Honorable William P. Mahon, the court issued a verdict on June 30, 2013, in favor of Appellees for $343,887.00 on the counts of unjust enrichment and promissory estoppel.[6]

All parties filed motions for post-trial relief. The trial court did not rule on the post-trial motions within 120 days, and on November 25, 2013, Appellants filed a praecipe for entry of judgment on the verdict. Judgment was entered, and this timely appeal followed.[7]

Appellant Stephen Russial has filed a substituted brief on appeal before this Court en banc. He raises the following issues for our review:

> 1. Did the trial court abuse its discretion and/or commit an error of law in holding Appellant, Stephen Russial, who was the shareholder and corporate officer of J3[], personally liable for

_____

[6] The trial court entered judgments in favor of Appellants/Defendants on Appellees/Plaintiffs' claims for breach of contract/implied duty of good faith and tortious interference with contractual relations. *See* Verdict, 7/3/13. The court found no mutual assent. *Id.* at n.4. *See Bair v. Manor Care of Elizabethtown, PA, LLC,* 108 A.3d 94, 96 (Pa. Super. 2015) (touchstone of any valid contract is mutual assent and consideration). Those judgments have not been appealed.

[7] Appellee/Defendant J3 has withdrawn its appeal from the judgment entered against it.

any amount under the theories of unjust enrichment/promissory estoppel or any other basis?

2.    Did the trial court abuse its discretion and/or commit an error of law in finding liability against Appellant, Stephen Russial, under the theory of unjust enrichment?

3.    In the event Appellant, Stephen Russial, or both Appellants, did in fact have liability to the Appellees under the legal theory of unjust enrichment, did the trial court abuse its discretion and/or commit error an of law and apply the wrong measure of damages?

4.    Did the trial court abuse its discretion and/or commit an error of law in finding liability against Appellant, Stephen Russial, or both of the Appellants, under the theory of promissory estoppel?

5.    In the event Appellant, Stephen Russial, or both of the Appellants, did in fact have liability to the Appellees under the legal theory of promissory estoppel, did the trial court abuse its discretion and/or commit an error of law and apply the wrong measure of damages?

6.    In the event the Superior Court affirms liability of Appellant, Stephen Russial, or both the Appellants, under unjust enrichment and/or promissory estoppel and affirms that the Appellees were entitled to damages based on lost commissions as opposed to reliance damages, was the amount of the trial court's verdict excessive and an abuse of discretion and/or an error of law?

Substituted Brief of Appellant Stephen Russial, at 4-6.

Our standard of review in non-jury cases is limited to:

a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below

and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Company Image Knitwear, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 330 (Pa. Super. 2006) (citation omitted). Additionally, this Court has stated that we will respect a trial court's findings with regard to the credibility and weight of the evidence "unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." *J.J. DeLuca Co. v. Toll Naval Associates*, 56 A.3d 402, 410 (Pa. Super. 2012), quoting *Ecksel v. Orleans Const. Co.*, 519 A.2d 1021, 1028 (Pa. Super. 1987).

Russial first asserts that the trial court abused its discretion and committed an error of law by holding Russial personally liable for the judgment entered against J3. For the following reasons, we find no error.

At trial, Gutteridge testified that he and Russial had done business together in the first half of 2007, and that during a road trip to Pittsburgh in the fourth quarter of 2007, they discussed forming the Group. *See* N.T. Trial, 6/12/12, at 160.

Q: At your deposition I remember asking you[,] when you met Steve Russial[,] were you aware of his company, J3 Energy Group, Inc., were you aware of that company?

A: Yes.

Q: And were you aware that the company was a corporation?

A: No, not specifically, but I assumed so.

. . .

Q:    Mr. Gutteridge, I'm handing you your deposition on January 6, 2012 of this year.   I'm bringing your attention to page 26, lines 14 through 21.  Would you read those and let me know when you're finished?

A:    "Let's talk about that.   One of my clients is J3 Energy Group[,] Inc.   Were you aware of J3 Energy Group, Inc. when you started dealing with Mr. Russial?"

"Yes."

"Were you aware that that was a corporation?"

"Yes."

. . .

Q:    I also asked you if, when you were dealing with Mr. Russial, were you dealing with him in his capacity as president of this corporation – of his corporation.  You don't remember what your answer was?

A:    I don't remember what my answer was, but when I first met Mr. Russial, I was dealing with him personally.  At the point that we started setting up the Energy Buyers Group, it was Applied Energy Partners[-] J3 venture.

Q:    I'm going to approach you one more time.

If I show you, again, page 26, the last three lines, and then your answer on the top of your deposition testimony?

A:    Yes.  You asked me in my dealings with Mr. Russial was he always dealing as president of J3 and I said I assumed so.

Q:    Thank you.

N.T. Trial, 6/13/12, at 8-10 (emphasis added).

The trial court credited Gutteridge's testimony that, when he first met Russial, Gutteridge believed that he "was dealing with him personally."  N.T. Trial, 6/13/12, at 10.   The court also heard Gutteridge's deposition testimony in which he stated that he assumed he was dealing with Russial as

- 9 -

president of J3. *Id.* Gutteridge testified that "[a]t the point that we started setting up the Energy Buyers Group, it was Applied Energy Partners[-] J3 venture." N.T., 6/13/2012, at 10.

The court specifically notes in its Pa.R.A.P. 1925(b) opinion that, "Gutteridge initially entered into the business relationship with . . . Russial." Trial Court Opinion, 6/11/14, at 4. Clearly, the court believed Gutteridge's testimony that he was dealing with Russial personally. The court stated that it "finds credible the testimony of . . . Gutteridge when considered against that of . . . Russial." *Id.* at 1.

The court found further support for its conclusion of personal liability in the following exchange that took place during Gutteridge's cross-examination:

> Q: Would you admit that neither you nor your company AEP has a written contract with either J3 Energy Group, Inc. or Mr. Russial?
>
> A: Formal written contract, no.
>
> Q: In your dealings with J3 Energy Group, did J3 Energy Group make it clear several times to you that it wanted a written contract in order to continue a business relationship with AEP?
>
> A: Yes, and I made the same representations in reverse.
>
> THE COURT: Mr. Gutteridge, I thought I heard testimony earlier on direct examination that Mr. Russial said to you that there was no need to do this in written form, as long as the respective obligations of the parties were well defined?
>
> A: Yes, Your Honor.

> THE COURT: So at what point in time did the idea of having a written document come into being? Because apparently early on there wasn't one, and it wasn't being pursued.
>
> A: No. You're right. After, I guess, March or so of 2008, is when the issue came up of should we form a separate legal entity to run the Energy Buyers Group. And [counsel for Appellants'/Defendants'] advice at the time was we didn't need that. But into the fall and the rest of the year 2009, the issue of how we should formalize the relationship came up a number of times over.

N.T. Trial, 6/13/12, at 10-11.

The court found that Russial and Gutteridge discussed the formation of the Energy Buyers Group as a joint venture between AEP and J3, but never executed written contracts. The court found no express contract, as there was insufficient evidence of "mutual assent." Based on this testimony, the court concluded that, once the parties were unable to come to a written agreement with respect to the Group, it was "perfectly reasonable for . . . Gutteridge to believe that the formation of the sales and marketing relationship *between himself and . . . Russial* was ongoing and continued despite their inability to formalize the creation of the Energy Buyers Group." Trial Court Opinion, 6/11/14, at 4 (emphasis added).

"In a non-jury trial, the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations." **Triffin v. Dillabough**, 716 A.2d 605, 607 (Pa. 1998). **See also Miller v. C.P. Centers, Inc.**, 483 A.2d 912, 915 (Pa. Super. 1984). "Assessments of credibility and conflicts in evidence are for

the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgments for those of the factfinder." *Turney Media Fuel v. Toll Bros.*, 725 A.2d 836, 841 (Pa. Super. 1999). "The test is not whether this Court would have reached the same result on the evidence presented, but rather, after due consideration of the evidence the trial court found credible, whether the trial court could have reasonably reached its conclusion. *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 686 (Pa. Super. 1998).

Here, the court's conclusion, that Gutteridge was dealing with Russial individually and that Gutteridge and Russial were parties to a failed business deal, is supported by evidence that the trial court deemed credible. Mindful of our limited role as an appellate court, we may not disturb that conclusion. *See Turney Media Fuel*, *supra*; *Terletsky*, *supra*. *See also Company Image Knitwear*, *supra* (when reviewing findings of trial judge in non-jury trial, evidence is viewed in light most favorable to victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected).

Appellants/Plaintiffs next assert that the trial court abused its discretion or committed an error of law by finding liability against Russial under the theory of unjust enrichment. We find no error or abuse of discretion.

"Unjust enrichment" is essentially an equitable doctrine. *Styer v. Hugo*, 619 A.2d 347 (Pa. Super. 1993). It is well-established that "[c]ourts

- 12 -

sitting in equity hold broad powers to grant relief that will result in an equitable resolution of a dispute." ***Williams Twp. Bd. of Supervisors v. Williams Twp. Emergency Co., Inc.***, 986 A.2d 914, 921 (Pa. Cmwlth. 2009). In addition, "a trial court must formulate an equitable remedy that is consistent with the relief requested . . ." ***Id.*** (citing ***North Mountain Water Supply Co. v. Troxell***, 81 A. 157 (Pa. 1911)).

In ***Stoeckinger v. Presidential Financial Corp. of Delaware Valley***, 948 A.2d 828 (Pa. Super. 2008), this Court held that:

> A claim for unjust enrichment arises from a quasi-contract. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." ***AmeriPro Search, Inc. v. Fleming Steel Co.***, 787 A.2d 988, 991 (Pa. Super. 2001).
>
> > The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.
>
> ***Styer v. Hugo***, 619 A.2d 347, 350 (Pa. 1993) (quotation marks omitted).

***Stoeckinger***, 948 A.2d at 833.

"To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to

retain." **_Torchia v. Torchia_**, 499 A.2d 581, 582 (Pa. Super. 1985) (quotation marks and citation omitted). The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather the most critical element of this equitable doctrine, which is whether the enrichment of the defendant is unjust. "The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." **_Styer_**, 619 A.2d at 350.

Here, the trial court found credible evidence that Russial committed wrongful acts by breaking his promises to Appellees/Plaintiffs after Appellees/Plaintiffs performed services in reliance on those promises. As a result, Russial kept all of the revenues from the Group, obtained through Appellees' efforts, and secured exclusive relationships with AEP's most productive channel partners.

The trial court found credible the evidence that Appellees/Plaintiffs expended considerable efforts attempting to develop the Energy Buyers Group and to persuade its AEP partners and their customers to market and purchase Appellants'/Defendants' services. The court found that, despite the fact that Russial had expressed disappointment with AEP's sales and marketing efforts, Russial had promised Appellees/Plaintiffs 35% of the revenues, and

> [a]fter AEP and its partners produced considerable income for [them, Russial and J3] then decided that *a relationship could be formed directly with AEP Partners Porreca and*

> *Keaton without the need for AEP or Gutteridge. Russial had obtained the services of the most committed AEP Partners and set out to develop a direct relationship with them and impact adversely their relationship with AEP*. Russial unilaterally determined that he would pay directly to Porreca and Keaton the percentage of sales commission that AEP was obligated to pay them as a result of their sales efforts for [Russial and J3's] services.

Trial Court Opinion, 6/11/14, at 4-5 (emphasis added).

The court found Appellees/Plaintiffs also presented credible evidence that the benefits that Appellants/Defendants secured unjustly were equal to the amount of money Appellees/Plaintiffs would have received had Appellants/Defendants not unilaterally altered the agreed 65%/35% revenue split arrangement. ***See*** Exhibit P-64 (showing total revenue for both procurement and demand services through December 31, 2011, totaling $982,537.00). The trial court determined that Gutteridge and AEP had an expectation of payment for services performed, that Russial wrongfully kept revenues obtained through Appellees/Plaintiffs' efforts, and that it would be inequitable for Appellants/Defendants to retain the benefits of that revenue without payment of value. ***See Wiernik v. PHH U.S. Mortgage Corp.***, 736 A.2d 616, 622 (Pa. Super. 1999). Accordingly, the trial court determined that Appellants/Defendants were unjustly enriched by retaining 35% of that amount, or $343,887.00.

Russial also argues that even if the trial court did not err in finding liability under unjust enrichment, the court abused its discretion and/or committed an error of law by applying the wrong measure of damages.

Russial argues the verdict was excessive and improperly calculated, and that the court improperly awarded damages "based on unpaid commissions, as opposed to reliance damages[.]" Appellant's Brief, at 26. Russial contends that, at most, Appellees/Plaintiffs were entitled to a commission of fifteen percent, which is the net they would have earned after paying commissions to A1 and/or Plastic Machinery Sales. Additionally, Russial notes that "J3 did, in fact, pay the twenty (20%) percent commission to A1 Energy and Plastic Machinery Sales." Appellant's Brief, at 27. Russial claims that the court's damages award is "perplexing" because it awarded damages on a "contract basis of 35% of gross revenues, instead of trying to determine a reasonable value for whatever services, if any, the Appellees[/Plaintiffs] provided" to Appellants/Defendants. *Id.* at 45. Accordingly, Russial asserts "the court's verdict of $343,887.00, which was calculated by the trial court by taking 35% of the gross sales of $982,537.00, should be reduced to no more than $147,380.55, which is 15% of the gross sales figure of $982,537.00." *Id.* We find no error.

Russial has been enriched, unjustly, and the measure of damages is the value of the benefits conferred; that is, Russial must make restitution to Appellees/Plaintiffs in *quantum meruit*. **AmeriPro Search Inc. v. Fleming Steel Co.**, 787 A.2d 988 (Pa. Super. 2001). The value was 35% of the revenue, which included Appellees'/Plaintiffs' obligation to compensate the channel partners for their commissions on those revenues. The fact that Russial may have unilaterally decided to pay directly to Porreca and Keaton

the 15% commission that AEP was obligated to pay them is, as the trial court noted, "not part of this litigation." **See** Verdict, 7/3/13, at n.4. "[Appellants'/Defendants'] willingness to pay AEP's sales commissions to Porreca and Keaton [does] not entitle them to a 'credit' against any claims that [Appellees/Plaintiffs] have against [Appellants/Defendants,] nor does it relieve [Appellants/Defendants] of any sales commission obligations that [they] may have to Porreca and Keaton." Trial Court Opinion, 6/11/14, at 5.

Russial has produced no evidence that the channel partners have released Appellees/Plaintiffs from their commission obligations. Therefore, had the trial court discounted the damages award to offset the commissions Appellants/Defendants paid to the channel partners, Appellees/Plaintiffs would be left responsible for paying commissions without having received full compensation.

Russial next asserts that the trial court abused its discretion or committed an error of law by finding liability under the theory of promissory estoppel.

Our Supreme Court has explained the doctrine of promissory estoppel as follows:

> Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment. [Restatement (Second) Contracts] § 90; **see, e.g.**, **Shoemaker v. Commonwealth Bank**, 700 A.2d 1003, 1006 (Pa. Super. 1997). In order to maintain an action in promissory estoppel, the aggrieved party

- 17 -

must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. *Id.* As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute.

*Crouse v. Cyclops Industries*, 745 A.2d 606, 610 (Pa. 2000).

Russial argues "there was no evidence presented by Appellees and the trial court made no findings in its Verdict or Opinion finding any of the three elements of promissory estoppel against either Appellant, especially Appellant Stephen Russial." Appellant's Brief, at 46. We disagree.

Here, the court found evidence that Appellants/Defendants made promises to Appellees/Plaintiffs that were expected to induce action by Appellees/Plaintiffs. The court found credible testimony that: (1) Russial personally promised a revenue sharing arrangement to Gutteridge; (2) their personal business relationship continued while they attempted to formalize the Group buying arrangement involving their companies; and (3) J3 promised AEP that in exchange for marketing its business, it would pay a percentage of the revenues generated from AEP so that AEP could pay commissions to its existing sales force.

There was also evidence that Appellants'/Defendants' promises induced Appellees/Plaintiffs to take various actions. As a result of Russial's promises, Gutteridge introduced Russial and J3 to the AEP channel partners, who made several sales calls to potential customers to market the Group. Furthermore, Gutteridge testified that AEP only sought to become involved in

the demand response and procurement market based on Appellants'/Defendants' promises to enter into the shared revenue arrangement. N.T. Trial, 6/12/12, at 187.

Lastly, the court concluded that "[e]quity demands that [Appellees/Plaintiffs] recover on the theory of promissory estoppel to the extent that [Appellants/Defendants] are unjustly enriched by 35% of the revenues that would otherwise be paid to [Appellees/Plaintiffs]." Trial Court Opinion, 6/11/14, at 4. In other words, permitting recovery on the promise is the only way to avoid injustice. *See Crouse*, *supra*.

This conclusion is supported by the testimony deemed credible by the trial court, that only once the Group met its target of 50 megawatts of purchasing volume, Appellants/Defendants decided they were unhappy with Appellees'/Plaintiffs' work. Appellants/Defendants then refused to pay Appellees/Plaintiffs unless they signed an agreement that would cut them out of the Group and allow Appellants/Defendants to use the AEP sales force for their exclusive gain. Appellees/Plaintiffs rejected this offer, and Appellants/Defendants then refused to pay the already agreed-to 35% of the revenues generated by the channel partners, which amounted to $343,887.

Appellants/Defendants then began paying AEP's two most productive and committed channel partners, Porreca and Keaton, directly for their services and had them sign non-compete agreements to the detriment of Appellees/Plaintiffs. Appellees/Plaintiffs thus lost the ability to sell to Porreca

- 19 -

and Keaton's clients, including the ability to sell them the services of their new vendor for energy procurement services, World Energy.

Russial argues there was no injustice in this case because "Appellees[/Plaintiffs] did not perform as they represented they would or could[.]." Appellants' Brief, at 47. Relying heavily on his own testimony, Russial claims "Appellees[/Plaintiffs] failed to identify 12 to 14 sales agents, as they represented they could do." *Id.* Russial also claims that Appellees/Plaintiffs purported to have a network of agents who could sell J3's services without J3 being involved in training or operating the network or closing sales. However, in light of the trial court's statement that it "finds credible the testimony of . . . Gutteridge when considered against that of []Russial," Trial Court Opinion, 6/11/14, at 1, Russial's contention that no injustice occurred fails. The court had before it Gutteridge's credible testimony that it was only when the 50 megawatt goal was reached, and the Group was about to realize revenues, that Appellants/Defendants communicated any dissatisfaction with Appellees'/Plaintiffs' efforts, and then engaged in conduct to lure away Appellees'/Plaintiffs' most successful channel partners. Under these circumstances, the trial court did not err in concluding that the doctrine of promissory estoppel applied in this matter.

Russial next argues that even if the trial court correctly found liability under the theory of promissory estoppel, it should have awarded only reliance damages to Appellees/Plaintiffs. Russial argues that "any recovery

- 20 -

under promissory estoppel would be for reliance damages, i.e., damages incurred in reliance of the alleged promise." Appellant's Brief, at 49.

Restatement (Second) of Contracts § 90(1), Comment d, provides, in relevant part:

A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate. But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise.

Accordingly, the general rule is that a plaintiff should be awarded the value of the defendant's promises unless equity dictates otherwise. Although Russial cites *Banas v. Matthews Int'l Corp.*, 502 A.2d 637 (Pa. Super. 1985), for the general proposition that "any recovery under promissory estoppel would be for reliance damages," Appellant's Brief, at 49, he paints with too broad a brush. Rather, as our Supreme Court noted, a promissory estoppel remedy may be limited as justice requires. *Lobolito, Inc. v. North Pocono Sch. Dist.*, 755 A.2d 1287, 1292 n.10 (Pa. 2000). Therefore, the issue is whether the trial court correctly found that the instant case does not involve equitable considerations that would justify deviating from contract damages.

Here, the trial court heard evidence regarding the sales and marketing activities that Appellees/Plaintiffs performed in reliance on Russial's promises. It also heard testimony regarding the losses that

Appellees/Plaintiffs sustained as a result of relying on those promises. Under these circumstances, the court concluded that the damages which are necessary to prevent injustice and to put Appellees/Plaintiffs in the position in which they would have been had Russial not unilaterally altered his relationship with Appellees/Plaintiffs, were the benefit of their bargain. We agree this was appropriate, and Russial has not demonstrated any equitable concerns that would justify a lesser, alternative calculation of damages.

Lastly, Russial claims that the verdict of $343,887.00 was excessive and/or improperly calculated. We have disposed of this argument already and find that Russial's claim is of no merit.[8]

As the trial court explained, Russial refused to abide by what had been agreed upon as the 65%/35% split, and unilaterally altered the arrangement and developed an exclusive direct relationship with Porreca and Keaton to Plaintiffs'/Appellees' detriment. We agree with the trial court's reasoning that "[Appellants'/]Defendants' willingness to [allegedly] pay AEP's sales commissions to Porreca and Keaton do[es] not entitle them to a 'credit'

_____

[8] We also note that in their Answer and New Matter to Plaintiffs' Second Amended Complaint, filed 1/26/11, Appellees/Defendants do not allege "payment" as an affirmative defense. *See* Pa.R.C.P. 1030(a) ("Except as provided by subdivision (b), all affirmative defenses including but not limited to the defenses of . . . payment . . . shall be pleaded in a responsive pleading under the heading "New Matter[.]" *See also* Pa.R.C.P. 1032(a) ("A party waives all defenses and objections which are not presented either by preliminary objection, answer or reply, except a defense which is not required to be pleaded under rule 1030(b)[.]").

against any claims that [Appellees/]Plaintiffs have against [Appellants/]Defendants[,] *nor does it relieve [Appellees/]Plaintiffs of any sales commission obligations that it may have to Porreca and Keaton*." Trial Court Opinion, 6/11/14, at 5 (emphasis added). Russial points to nothing in the record to support a finding that Porreca and Keaton have released AEP from its commission obligations. We find no error. ***See Lesoon v. Metropolitan Life Ins. Co.***, 898 A.2d 620 (Pa. Super. 2006) (duty of assessing damages is for factfinder, whose decision will not be disturbed on appeal unless record clearly shows caprice, partiality, prejudice, corruption, or other improper influence); ***see also Delahanty v. First Pennsylvania Bank***, 464 A.2d 1243, 1257 (Pa. Super. 1983) ("In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence.").

Judgment affirmed.

President Judge Gantman, President Judge Emeritus Ford Elliott, President Judge Emeritus Bender, Judge Panella, and Judge Ott join the Opinion.

Judge Bowes files a Concurring and Dissenting Opinion in which Judge Shogan and Judge Olson join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/17/2017</u>