J-S24017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| GRETA E. STIMELY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GARY G. STIMELY, JR. | : | |
| | : | |
| Appellant | : | No. 56 MDA 2023 |

Appeal from the Order Entered December 13, 2022
In the Court of Common Pleas of Mifflin County Civil Division at No(s):
2018-00964

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED: JULY 14, 2023**

Gary G. Stimely, Jr. (Husband), appeals from the order, entered in the Court of Common Pleas of Mifflin County, granting specific performance of a marital agreement and awarding Appellee, Greta E. Stimely (Wife) any "remaining right, title[,] and interest in the [parties'] former marital residence," including the profit from the sale of the residence and homeowners' insurance proceeds.  After careful consideration, we affirm.

Husband and Wife were married on May 19, 1990.[1]  On January 5, 1995, the parties purchased property (marital residence/Property) in Mifflin County and obtained homeowners' insurance on the Property from State Farm Fire and Casualty Company.  In June 2006, Wife discovered that Husband was

_____

[*] Former Justice specially assigned to the Superior Court.

[1] At the time of trial, the parties had four adult children.

having an extra-marital affair.  In an attempt to salvage the marriage, the parties attended counseling where Husband was advised to execute a postnuptial agreement (Agreement).  The notarized agreement, which was signed by Husband, contained the following, relevant, infidelity clause:

> I, Gary Stimely, agree that **if I am to do any of the following ever again**[,] that **I** will give up all rights to the children and **will give Greta everything including the house**, car, child support, etc[.]  I will only keep my clothes and the vehicle I drive.  I will not go after Greta for any type of support at all.  Those things include the following but are not limited to:
>
> **Another affair**
> Lie to Greta about anything
> Talking with other women
> Flirting with other women
> Looking at other woman in a wrong (lustful) way
> Making sexual remarks to another woman
> Phoning another woman
> Consulting another woman
>
> I may at any time add additional items to the list above. Greta may add additional items to above list.
>
> Gary G. Stimely Jr.

Agreement, 12/29/06 (emphasis added).  In exchange for the above, Wife permitted Husband to "remain a part of the family unit."  Plaintiff's Response to Defendant's New Matter and Answer, 10/26/18, at 1; *see also* N.T. Non-Jury Trial, 9/29/22, at 16 (Wife testifying in exchange for Husband executing Agreement, "he [was permitted to] move into the house and . . . bec[o]me a family again").

The parties lived "separate and apart"[2] in the marital residence from June 2016 until November 2016, until Wife discovered Husband was having another affair. At that point, Husband moved out of the marital residence with only his clothes and car.

Wife subsequently filed a complaint in divorce; a divorce decree issued on October 17, 2017. The decree does not address any economic claims between the parties and the parties did not seek equitable distribution of any marital assets in the divorce proceeding.[3] In January 2018, State Farm removed Husband from the homeowners' policy, at Wife's request. In June 2018, the Property was destroyed by a fire. Wife sold the Property following the fire and received $6,500.00 from State Farm as a stipend for alternative living arrangements and $5,000.00 for loss of contents. In addition, Wife received $149,776.34 for the loss of the Property. To date, $17,602.82 is being held in escrow from the sale of the Property and $30,711.59 of unpaid insurance proceeds remains available.

When Husband refused to sign over the Property to Wife in accordance with the Agreement, Wife filed a complaint for specific performance on August 20, 2018. In the complaint, Wife "request[ed] that [Husband] be ordered to specifically perform the Agreement and convey the [marital] premises to [her]

_____

[2] Husband initially refused to move out of the marital residence. Instead, he moved into the basement where he resided until November 2016. *Id.* at ¶ 15.

[3] *See* N.T. Non-Jury Trial, 9/29/22, at 119 (Husband testifying no economic claims raised in parties' divorce proceeding).

and determine that the proceeds from the fire insurance policy are the sole property of [Wife]."[4]  Complaint, at 8/20/18, at ¶ 12.  In his answer and new matter, Husband alleged that the Agreement:  lacked consideration; was an invalid contract that lacked mutuality of obligation; and was against public policy.  Husband also filed counterclaims against Wife for unjust enrichment and breach of fiduciary duty.

A bench trial was held on September 29, 2022, at which Husband, Wife, Wife's mother, Wife's sister, and two of the parties' daughters testified.  The court gave Wife the remaining right, title, and interest in the Property, awarded her 100% of the proceeds from the sale of the Property, as well as the entirety of the remaining, escrowed insurance proceeds from State Farm.[5]  The court specifically concluded that 23 Pa.C.S.A. § 3502 of the Divorce Code did not preclude Wife from recovering the proceeds from the Property.  Moreover, the court determined that equitable relief was warranted where Wife's reliance on Husband was "reasonable and just" since he:  (1) did not contest the divorce; (2) did not seek custody of the parties' children; (3) did

_____

[4] Wife averred that she had been paying the insurance premium since July 2017.  *Id.* at ¶ 15.

[5] The order specifically stated that Wife was to receive "all sums held in escrow as a result of the sale of the residence and any insurance proceeds due on account of its loss shall [also] be paid to [Wife]."  Order, 12/13/22.

- 4 -

not oppose Wife removing Husband from the State Farm policy;[6] and (4) did not seek equitable distribution of the parties' marital assets.

Husband filed a timely notice of appeal.[7]  He presents the following issues for our consideration:

> (1)    Did the trial court, in a subsequent civil action for breach of contract and specific performance, have subject matter jurisdiction to review and enforce a purported marital settlement agreement that was not asserted in the parties' prior divorce action wherein no economic claims were raised?
>
> (2)    Did the trial court commit an error of law in finding that the purported marital settlement agreement was sufficiently clear and definite to constitute an enforceable contract?
>
> (3)    Did the trial court commit an error of law in finding that the doctrine of promissory estoppel applied in this case in concluding that [Wife] justifiably relied upon promises made by [Husband]?

Appellant's Brief, at 4.

Specific performance is an equitable remedy not available as a matter of course, but only in unique situations.  **Pugh v. Holmes**, 405 A.2d 897, 908 (Pa. 1979).  Whenever there is a request for specific performance of a property settlement agreement, it necessarily implicates a contract issue. **See Krasinger v. Krasinger**, 928 A.2d 333 (Pa. Super. 2007) (marital

_____

[6] State Farm sent Husband a letter, dated January 20, 2018, advising him that it had "received an insured request to remove [him] as a named insured" from the parties' homeowners' policy.  State Farm Letter, Exhibit "No. 1," 1/30/18.

[7] The trial court did not order Husband to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

settlement agreements governed by law of contracts, unless merged into divorce decree).[8]

Husband first contends that the trial court lacked subject matter jurisdiction to enforce the parties' Agreement because it was "a matter exclusively within the jurisdiction of the divorce court." Appellant's Brief, at 10. We disagree.

In *Swartz v. Swartz*, 689 A.2d 302 (Pa. Super. 1997), our Court concluded that "the existence of a court-imposed order of support does not vitiate a private agreement for support that has not been merged into a decree of divorce, nor does it impede either part[y's] ability to enforce the terms of the agreement in an action in assumpsit or equity." *Id.* at 305. Of particular note, the *Swartz* panel recognized that "support orders and private agreements that are independent of or survive a divorce decree, are not mutually exclusive." *Id.* Similarly, in *Nicholson v. Combs*, 703 A.2d 407 (Pa. 1997), our Supreme Court disavowed any notion that a private marital agreement would be invalidated by a party's recourse to family court. *Id.* at 417. In *Nicholson*, the Court held that "a family court's determination . . . does not preclude the court sitting in . . . equity from determining that the terms of [a support] agreement are enforceable." *Id.*

---

[8] By contrast, a marital settlement agreement that is merged into the divorce decree is subject to the provisions of the Divorce Code. *See Sonder v. Sonder*, 549 A.2d 155 (Pa. Super 1988).

Here, the parties' Agreement is independent of the divorce decree entered by the court in October 2017, and was not merged into their divorce decree. *See McMahon v. McMahon*, 612 A.2d 1360, 1363 (Pa. Super. 1990) (property settlement agreement, that "states on its face that [it] . . . does not merge [with divorce decree,]" must be treated "as a separate and independent contract"). Just as in *Swartz* and *Nicholson*, the trial court exercised its equitable powers to enforce and determine the parties' rights under the Agreement. Moreover, because the Agreement was not addressed in the divorce decree or a part of the divorce proceedings, section 3104 of the Divorce Code[9] is neither controlling nor applicable.[10]

To the extent that Husband contends that the terms of the Agreement violate public policy and are unenforceable due to lack of consideration, we find no merit to these claims.

---

[9] Section 3104 sets forth the jurisdictional bases of courts in divorce cases and marriage annulments, including over matters involving disposition of property rights between spouses. However, again, the parties chose to not make the Property part of their divorce proceedings, thus it was not subject to the provisions of section 3104.

[10] In fact, the divorce decree notes that the "this [c]ourt retains jurisdiction of **any claims raised by the parties in __this__ action** for which a final order has not yet been entered." Divorce Decree, 10/18/17 (emphasis added). As previously stated, the parties did not raise any equitable claims in their divorce action, instead leaving all marital assets to be distributed through the parties' independent post-nuptial agreement. By contrast, the trial court's order, granting Wife her equitable relief with regard to specific performance of the Agreement, notes "[t]he [c]ourt shall retain jurisdiction for the purpose of the enforcement of this order." Order, 12/13/22.

In *Laudig v. Laudig*, 624 A.2d 651 (Pa. Super. 1993), a husband and wife similarly entered into a post-nuptial agreement after husband discovered that wife had been having an extra-marital affair. The agreement limited wife's marital property rights in the event that she subsequently became involved in another extramarital affair. When wife had a subsequent affair, husband filed for divorce and claimed that the parties' post-nuptial agreement was determinative as to all matters pertaining to equitable distribution. The court upheld the master's recommendation that the parties' agreement was valid and that wife's claim to the marital property was limited by the terms of the agreement.

On appeal, wife also claimed that the agreement violated public policy and was unenforceable due to lack of consideration. Our Court found that the parties' intent, as expressed in the agreement, was clear—"[h]usband and wife contractually agreed to dispose of their marital property in a specified manner in the event of infidelity on wife's part." *Id.* at 653. Likewise, the Court observed that, in the event of no further infidelity by wife, "normal distribution of marital property [via equitable distribution] would be made." *Id.* at 654. The Court determined that the agreement did not violate public policy because it "allow[ed] the parties to avoid the operation of equitable distribution." *Id.* at 655. Finally, our Court concluded that, even without consideration, the agreement was enforceable because it contained a provision expressing the parties' intent to be legally bound. *Id.* at 654-55.

*Laudig* is on all fours with the instant matter and supports the conclusion that the Agreement is not invalid for lack of consideration or violative of public policy. The record is clear that there was consideration in the instant case—in exchange for executing the Agreement, Wife permitted Husband to "remain a part of the family unit." N.T. Non-Jury Trial, 9/29/22, at 16 (Wife testifying in exchange for Husband executing Agreement, "he [was permitted to] move into the house and . . . bec[o]me a family again"). Further, the Agreement does not violate public policy where Wife and Husband entered into the Agreement in order to avoid pursuing distribution of their marital assets in divorce proceedings.

Husband next contends that Wife was required to seek the proceeds of selling the Property by way of equitable distribution, and that her failure to do so precludes her from enforcing the Agreement. We disagree.

While a court "shall equitably divide, distribute[,] or assign, in kind or otherwise the marital property between the parties without regard to marital misconduct," that is done only "[**u**]**pon the request of either party** in an action for divorce." 23 Pa.C.S.A. § 3502(a) (emphasis added). Moreover, it is well-established that parties to a divorce action may bargain between themselves and structure their agreement as best serves their interests. *Knorr v. Knorr*, 588 A.2d 503, 505 (Pa. 1991), citing *Brown v. Hall*, 435 A.2d 859 (Pa. 1981). "Marital agreements allow parties to dispose of their property rights regardless of the reasons behind the termination of their marriage." *Laudig*, *supra*, at 655.

Here, Wife and Husband intended to dispose of their marital property, outside of divorce proceedings, in a specified manner, in the event that Husband, among other things, had another extra-marital affair. They intentionally **did not request** to have their marital property distributed through the divorce proceeding as per section 3502(a). As our Court acknowledged in **Laudig**, a post-nuptial agreement containing an infidelity clause permits parties "to avoid the operation of equitable distribution." **Id.** at 655. Thus, we find no merit to this claim on appeal.

Husband next argues that the Agreement "is too vague and indefinite to enforce." Appellant's Brief, at 16. Husband also claims that because the parties drafted the Agreement so that he could "add additional items to the list [of prohibited conduct,]" it does not contain definite [terms] and, therefore, he cannot be legally bound by it. **Id.** at 18. We disagree.

The language of the infidelity clause is clear—Husband "agree[s] to . . . give up all rights to . . . the house" if he has "[a]nother affair." Agreement, 12/29/06. **See Creeks v. Creeks**, 619 A.2d 754, 756 (Pa. Super. 1993) ("When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding."). As acknowledged in **Knorr**, **supra**, parties to a divorce action may structure their agreement as best serves their interests. Further, infidelity clauses, containing similar language, have been upheld in marital settlement agreements. **See Laudig**, **supra**. Here, the parties' intent was expressed through the precise language in the Agreement stating that

Husband "agrees that **if** [**he has**] . . . [**a**]**nother affair** . . . [he] will give up all rights to the children and will give [Wife] everything including the house, car, child support, etc. [and] will only keep [his] clothes and the vehicle [he] drives." Agreement, 12/29/06 (emphasis added); *see Laudig*, *supra* at 653 ("The parties' intent, as expressed in their post-nuptial agreement in this case, is clear. Husband and wife contractually agreed to dispose of their marital property in a specified manner in the event of infidelity on wife's part."). Thus, we find no merit to this claim on appeal.

Finally, Husband contends that the court erred in concluding that promissory estoppel applied in the instant matter by finding that Wife justifiably relied upon promises Husband made.

> In order to maintain an action in promissory estoppel, the aggrieved party must show that[:] (1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise. As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute.

*Gutteridge v. J3 Energy Grp., Inc.*, 165 A.3d 908, 911 (Pa. Super. 2017).

We find support in the record for the trial court's determination that Wife reasonably relied upon the Agreement where she opted not to seek equitable distribution of marital assets through the divorce proceedings. Specifically, Wife testified that she "trusted [Husband] would sign [the] deed [over to her]," N.T. Non-Jury Trial, 9/29/22, due to her reliance on the signed, notarized Agreement that Husband executed. *See also id.* at 33 (Wife

- 11 -

testifying she relied on Husband's promises in Agreement); *id.* at 32 (Wife testifying "[b]ecause [the Agreement] is signed and notarized . . . I didn't think [Husband] could get out of it"); *id.* at 25 (Wife testifying she "had conversations with everybody in [her] life about the [A]greement . . . with [Husband] sitting there because [she] always wanted him to remember [it]"); *id.* at 64 (Wife's sister testifying Husband saying in her presence, to Wife, he signed Agreement so that she would take him back and that if he violated Agreement he would "give [her] everything, . . . give [her] the girls[,] give [her] the house[, and] leave [her] completely alone").[11]   Significantly, Husband, himself, agreed that, after he had another affair and left the marital residence with just his clothes and car, "it [wa]s certainly reasonable for [Wife] to believe that [Husband] was following the terms of t[he A]greement."  *Id.* at 129-30.   Accordingly, we conclude that the court properly applied the doctrine of promissory estoppel and bound Husband to the terms of the parties' Agreement.  *Laudig*, *supra*.[12]

_____

[11] Notably, the court stated in its Rule 1925(a) opinion that, "to the extent they exist, we are prepared to resolve issues of credibility in favor of [Wife]." Trial Court Opinion, 12/13/22, at 1 n.1.

[12] Instantly, neither party contests that Husband did, in fact, engage in an extra-marital affair after he executed the Agreement.  *See* N.T. Non-Jury Trial, 9/29/22, at 129 (Husband testifying he "committed multiple affairs after signing th[e A]greement").  While Husband alleges that he entered into the Agreement under duress for fear that Wife "would attempt to alienate him from the parties' children," Wife, whom the court found credible, *see supra* at n.11, testified Husband consistently told her and others that he agreed to give her the Property if he ever cheated on her again, that he was not "tricked"
*(Footnote Continued Next Page)*

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/14/2023

---

into signing the Agreement, that he read the Agreement before he signed it, that he was not under the influence of alcohol or drugs when he signed it, and that no one "put a gun to his head" to sign it. **See** N.T. Non-Jury Trial, 9/29/22, at 127; **id.** at 26 (Wife testifying Husband told Wife's mother, brother, and sister he "gave [Wife] a post-nuptial agreement [saying] that if [he] cheat[s, Wife] will get everything"); **id.** at 36 (Wife testifying Husband would tell her "over and over again" that marital residence was hers and "he was giving her the house").