J-S33005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHARLES P. DANIELS AND IMRAN DALVI | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 552 MDA 2018 |
| ATLANTIC COMMUNITY BANKERS BANK AND JON EVANS | : | |

Appeal from the Judgment Entered May 24, 2018
In the Court of Common Pleas of Cumberland County Civil Division at
No(s):  14-2240

BEFORE:  LAZARUS, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:          **FILED SEPTEMBER 10, 2019**

Charles P. Daniels and Imran Dalvi (collectively "the Plaintiffs") appeal from the judgment, entered in the Court of Common Pleas of Cumberland County, following the court's partial grant of summary judgment dismissing the Plaintiffs' unjust enrichment claim, and a jury verdict finding Plaintiffs were not due relief under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. § 34:19-1, *et seq*.  After careful review, we affirm.

Since 2001, Jon Evans has served as president and chief executive officer of Atlantic Community Bankers Bank ("ACBB") (collectively "the

Defendants"), a bankers' bank[1] with client institutions across the Mid-Atlantic and Northeastern United States. In 2004, Evans approached the Plaintiffs with a business plan under which they would spearhead the establishment of a telecommunications subsidiary, wholly owned by ACBB, allowing ACBB to provide technology services directly to client banks. The Plaintiffs presented their business plan to ACBB's board of directors, who approved the plan to form a subsidiary under the name ACBB-BITS, LLC ("BITS"), with ACBB as the majority owner.

To receive regulatory approval for BITS, Evans and Daniels sought a Letter of Non-Objection ("LONO")[2] from the Federal Reserve Bank and the Pennsylvania Department of Banking. The organizations rendered a LONO after Evans and Daniels submitted, among other materials, the BITS'

---

[1] A bankers' bank is "a bank that deals only with other banks." Merriam-Webster, https://www.merriam-webster.com/dictionary/banker's%20bank (last visited August 20, 2018)

[2] The Defendants' expert witness on banking regulations defined a LONO as follows:

> The primary regulator issues a [LONO] to inform the financial institution the proposed activity has been reviewed and is in conformance with relevant laws, rules, and regulations, the activity does not present an unsafe or unsound banking practice to the institution as presented, and the Board and management of the financial institution have the capacity, competence and expertise to manage the activity.

Nowe Expert Report, at 3.

operating agreement, which outlined the following features: 1) a shared ownership structure; 2) a provision for annual cash distributions totaling 90% of BITS' net income; 3) a prohibition against BITS borrowing in excess of 5% of ACBB's shareholder equity; and 4) a requirement for ACBB to sell 2.5 million out of 10 million of BITS membership units to ACBB's client banks.[3] After receiving the LONO, ACBB incorporated BITS as a limited liability company in Pennsylvania, with business operations based in New Jersey.

In 2005, BITS hired Daniels as its chief executive officer and Dalvi as its chief financial officer. In return for accepting positions at below-market-rate salaries, the Plaintiffs received BITS membership units that entitled them to distributions of BITS' net income, but not to voting rights on decisions requiring a majority or supermajority of members.[4] Their employment agreements allowed the Plaintiffs to invoke a constructive termination clause in the event management interfered with certain provisions of the operating agreement, including the provision concerning the distribution of net income. If properly invoked, the constructive termination clause entitled the Plaintiffs

---

[3] BITS membership units, effectively shares of stock, were divided separate classes. *See* BITS Operating Agreement, 3/1/05, at 4. The original operating agreement called for the above-mentioned 2.5 million membership units to be sold from the Class A tranche. *Id.*

[4] Only Class A and D membership units entitled members to voting rights. *See* BITS Operating Agreement, 10/16/06, at 8.

to severance, but required them to sell back their membership units within four years.

Pursuant to the operating agreement, Evans served as BITS' managing member, a role which granted him considerable control over regular business operations. The Plaintiffs allege, beginning in 2006, ACBB and Evans began undermining the terms under which the Plaintiffs joined BITS, specifically highlighting the following: 1) ACBB's 2006 resolution decreasing the target for sales of membership units to financial institutions from 2.5 million to 1 million; 2) ACBB holding BITS debt in excess of 5% of ACBB's shareholder equity; and 3) ACBB's 2010 resolution amending the BITS operating agreement such that the distribution of 90% of net income became a goal, not a requirement, with the exact distribution figure to be set by Evans. Daniels and Dalvi believed these changes delayed BITS from becoming profitable, contravened the LONO under which ACBB obtained permission to form BITS, and defrauded the shareholders who purchased shares under the premise that 90% of BITS' net income would be distributed annually.

In 2011, the Plaintiffs informed Evans if the terms of the original operating agreement were not restored, they would exercise their respective constructive termination clauses and inform regulators of the changes to the operating agreement. These threats were repeated to Evans and board members periodically over the next two years. Evans viewed these threats as

empty, as changes to the operating agreement were disclosed to regulators via routine submissions.

Over the next two years, the Plaintiffs signed several amendments to their employment agreements extending the time frame in which they could exercise their constructive termination clauses. On February 19, 2013, the Plaintiffs signed their final extensions. On March 1, 2013, Daniels met with board member James Deutsch, and Daniels informed Deutsch that the Plaintiffs intended to inform regulators of ACBB's refusal to adhere to the terms of the operating agreement and the LONO. On March 13, 2013, Daniels sent an email to Evans so that Evans could relay the Plaintiffs' grievances to the board in person. In that email, Daniels explained that he, Dalvi and other BITS executives intended to resign if the board allowed Mitch Wienick to retain his seat on the board, expressing a particular concern that Wienick intended to sell BITS. Evans circulated the email to the entire board.

The following day, the board voted unanimously to part ways with Daniels, and authorized Evans to determine whether Dalvi supported Daniels' insubordination. On March 26, 2013, Evans handed Daniels notice of the board's decision to terminate his employment. When Dalvi affirmed his support for Daniels, Evans handed Dalvi his termination letter. Evans cited Daniels' ultimatum regarding Wienick as the sole reason behind the decision to fire both Plaintiffs. Daniels and Dalvi exercised their constructive

- 5 -

termination clauses, pursuant to which they were compensated in accordance with the terms of their employment agreement.[5]

On December 6, 2013, the Plaintiffs filed a demand for arbitration. In response, the Defendants filed a petition to stay arbitration. The court granted the Defendants' petition, stating the arbitration clauses in the Plaintiffs' employment agreements—between the Plaintiffs and BITS—did not cover action against the named Defendants. On March 18, 2015, this Court affirmed the lower court's decision. **See Atlantic Community Bankers Bank, Inc. v. Daniels**, 635 MDA 2014 (Pa. Super. March 18, 2015) (unpublished memorandum). Our Supreme Court denied review. **See Atlantic Community Bankers Bank, Inc. v. Daniels**, 125 A.3d 775 (Pa. 2015) (Table).

On April 14, 2014, during the pendency of the above-mentioned appeal, the Plaintiffs initiated the instant suit, asserting two claims under CEPA[6]—one alleging ACBB fired the Plaintiffs in retaliation for attempting to reveal what they reasonably believed to be a violation of a law, rule or regulation, and

---

[5] Daniels received $504,572.23. Dalvi received $477,774.03.

[6] CEPA, the New Jersey whistleblower statute, was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." **Abbamont v. Piscataway Tp. Bd. of Educ.**, 650 A.2d 958, 971 (N.J. 1994).

another asserting they were fired in retaliation for what they reasonably believed to be fraud—as well as a third claim for unjust enrichment.

On March 18, 2016, the Defendants filed a motion for summary judgment. On June 7, 2017, the Honorable Christylee L. Peck denied the Defendants' motion for summary judgment with regard to the Plaintiffs' CEPA claims, but granted the motion with regard to their unjust enrichment claim. Specifically, Judge Peck made the following findings: (1) the factual circumstances of the case gave rise to a false conflict between CEPA and Pennsylvania's whistleblower statute,[7] rendering the Plaintiffs' whistleblower claims judiciable in Cumberland County under New Jersey law; (2) the Plaintiffs established *prima facie* CEPA claims; and (3) the defendants were entitled to summary judgment on the unjust enrichment claim because of the existence of a contract between the Plaintiffs and BITS, and because the Plaintiffs' injury resulted indirectly from the Defendants' conduct.

Before trial, the Plaintiffs moved to prevent the Defendants from offering James E. Nowe, a retired federal regulator from the Office of the Comptroller of Currency ("OCC"), [8] as an expert witness. The Honorable Judge Edward E.

---

[7] **See** 43 P.S. § 1421, *et seq*. Plaintiffs, as employees of a private organization, would have been unable to seek relief under Pennsylvania's whistleblower statute, which prohibits public bodies or certain entities receiving money from a public body from discharging employees for reporting or threatening to report wrongdoing. 43 P.S. § 1422.

[8] The OCC defines its mission as follows:

Guido denied Plaintiffs' motion *in limine* in part, permitting Nowe to testify "[o]nly to the extent that the Plaintiffs' belief was reasonable, and so in that regard Defendants are going to have to lay some type of foundation as to the Plaintiffs' knowledge or awareness of the applicable rules and regulations." N.T. Trial, 2/26/18, at 7–8.

During the Plaintiffs' case-in-chief, Daniels testified to the process surrounding the adoption of the 2010 resolution[9] amending the BITS operating agreement. He agreed the operating agreement, by its own terms, could be amended, and confirmed that in December 2010, a supermajority of voting shareholders lawfully amended the operating agreement. Daniels himself communicated the amendments to the operating agreement to regulators.[10] Daniels, nonetheless, asserted his belief that it had been unlawful for ACBB

_____

> The OCC charters, regulates, and supervises all national banks and federal savings associations as well as federal branches and agencies of foreign banks. The OCC is an independent bureau of the U.S. Department of the Treasury.

Office of the Comptroller of the Currency, *What We Do*, https://www.occ.treas.gov/about/what-we-do/mission/index-about.html (last visited Aug. 16, 2019).

[9] Daniels claimed the above-mentioned changes were enforced in 2009, but only formally adopted by the board in 2010. N.T. Trial, 2/27/18, at 85.

[10] The following exchange took place on cross-examination, "[Q:] And some of the information you communicated to the regulators were changes, for example, . . . in the operating agreement, right? [A:] . . . yes, the operating agreement." N.T. Trial, 2/27/18, at 211.

and BITS to amend the operating agreement in a manner that constructively terminated himself and Dalvi and interfered with their rights as shareholders.

During the Defendants' case-in-chief, Judge Guido revisited his decision regarding the permissible scope of Nowe's testimony. The court found that the Defendants failed to lay a foundation as to the Plaintiffs' knowledge of banking regulations; therefore, Nowe could not testify as to whether the Plaintiffs' held reasonable beliefs. Judge Guido, however, found the Defendants had laid a foundation for Nowe to testify as to whether the Defendants' behavior was retaliatory, specifically highlighting testimony describing the Plaintiffs' threats as "nonsensical." N.T. Trial, 3/1/18, at 529; *see also id.* at 530 ("He can legitimately testify that no one with knowledge of banking regulations would be concerned about the [Plaintiffs'] report, and that goes to the issue of whether or not the [Defendants'] actions were retaliatory."). Both the original and revised rulings confined the scope of Nowe's testimony to the same, two-paragraph section of his expert report.[11]

Prior to Nowe testifying, both parties stipulated that ACBB "had the authority to amend [the operating agreement], it was done legally, and there were proper tax purposes behind the amendment." N.T. Trial, 2/28/18, at 520. Consequently, during the Plaintiffs' cross-examination of Nowe, Judge

---

[11] Nowe's expert report is divided into four sections, with the third section, addressing the 2010 amendment to the BITS operating agreement, being the only one at issue. *See* James Nowe's Expert Report, at 3.

Guido sustained the Defendants' objection when Plaintiffs asked whether regulators would have been concerned if they received a report alleging that ACBB defrauded shareholders by changing BITS' operating agreement.

Before submitting the case to the jury, Judge Guido determined the Plaintiffs' fraud-related CEPA claim rested solely upon the impact of the board amending the operating agreement's provisions concerning distributions. He further found that no reasonable person could conclude BITS shareholders had been defrauded, as the changes to the operating agreement were properly implemented by supermajority vote, and because the Plaintiffs' employment agreements contemplated the fact that the board could take such action. Finding no reasonable person could deem the Defendants' conduct fraudulent, Judge Guido refused to instruct the jury on the Plaintiffs' fraud-related CEPA claim.

The case moved to the jury solely on the issue of whether the Defendants' violated CEPA by firing the Plaintiffs in retaliation for attempting to reveal what they reasonably believed to be a violation of a law, rule or regulation. The verdict slip asked the following special questions:

> 1) Did [the Plaintiffs] believe that the failure to inform the regulators of the change in the operating agreement in 2010 was a violation of the Letter of Non-Objection[;]" 2) "Was [the Plaintiffs'] belief reasonable[;]" and 3) "Was the discharge of [the Plaintiffs] on March 26, 2014 done in retaliation for [their] threat to report the change in the operating agreement to regulators?

Daniels Verdict Slip, 3/2/18, at 1; Dalvi Verdict Slip, 3/2/18, at 1. A majority of the jury answered the first two questions in the affirmative. The jury, however, answered the third question in the negative, denying the Plaintiffs relief.[12]

The Plaintiffs filed a motion for post-trial relief on March 7, 2018, which the court denied on March 9, 2018. On April 2, 2018, the Plaintiffs timely filed a notice of appeal.[13] Both the Plaintiffs and the court below complied with Pa.R.A.P. 1925.

The Plaintiffs present the following issues for our review:

1.      Whether [Nowe's testimony] was relevant to the claims and defenses arising under CEPA.

2.      Whether the probative value of . . . Nowe's expert opinion was outweighed by its tendency to prejudice the jury.

---

[12] The jury voted for the special questions regarding Daniels as follows: question 1) 10 yes, 2 no; question 2) 10 yes, 2 no; and question 3) 2 yes, 10 no. Daniels Verdict Slip, 3/2/18, at 1. The jury voted for the special questions regarding Dalvi as follows: question 1) 11 yes, 1 no; question 2) 11 yes, 1 no; and question 3) 0 yes, 12 no. Dalvi Verdict Slip, 3/2/18, at 1.

[13] On April 26, 2018, this Court issued an order directing the Plaintiffs to show cause why the appeal should not be dismissed, as post-trial motions remained pending. Order, 4/26/18, at 1. The Plaintiffs filed a response on April 27, 2018. Appellants' Reply to Order to Show Cause, 4/27/18, at 1–6. On July 13, 2018, this Court, *per curiam*, discharged the show cause order. Order, 7/13/18, at 1. The Plaintiffs' response, including both the docket and the stamped order, makes clear that Judge Guido ruled on Plaintiffs' post-trial motion on March 9, 2018, and the prothonotary entered Judge Guido's order on March 13, 2018. Appellants' Reply to Order to Show Cause, 4/27/18, at 5–6. Judgment on the verdict was entered on April 24, 2018. Consequently, the instant appeal is properly before us. Pa.R.A.P. 301(a)(1) .

3. Whether Plaintiffs were entitled to present evidence and testimony pertaining to their belief that Defendants had engaged in a course of conduct that may have defrauded shareholders.

4. Whether the jury should have been charged with deciding whether Plaintiffs had a reasonable belief that shareholders were being defrauded.

5. Whether Plaintiffs' claim for unjust enrichment was susceptible to dismissal on summary judgment.

Brief of Appellants, at 6–7.

Plaintiffs first three claims concern the admission or exclusion of evidence, decisions which rest "within the sound discretion of the trial court[.]" **B.K. v. J.K.**, 823 A.2d 987, 991–92 (Pa. Super. 2003). In reviewing these claims, "we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." **Id.** "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." **Sutherland v. Monongahela Valley Hosp.**, 856 A.2d 55, 59 (Pa. Super. 2004). Moreover, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." **Hawkey v. Peirsel**, 869 A.2d 983, 989 (Pa. Super. 2005).

First, the Plaintiffs claim Nowe's testimony[14] was irrelevant to the purpose for which it was admitted before trial—namely, whether the Plaintiffs reasonably believed a regulatory violation occurred. Brief of Appellant, at 19–27.

Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.E. 401. The threshold for relevance is low given the liberal "*any* tendency prerequisite. **Id.** (emphasis added). "Relevant evidence is admissible, except as otherwise provided by law." **Mitchell v. Shikora**, 209 A.3d 307, 314 (Pa. Super. 2019) (quoting Pa.R.E. 402).

The Plaintiffs challenge the relevance of Nowe's testimony in the context of a CEPA claim. **See** Brief of Appellant, 24 ("[T]he [c]ourt's decision to allow the testimony of an expert for which there was no foundation and which did not relate to any element of CEPA was a clear abuse of discretion."). CEPA, in relevant part, reads as follows:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> > a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

---

[14] Neither party disputes Nowe's status as an expert or the bases upon which his expert opinion rests. **See** N.T. Trial, 2/28/18, at 533 (following Nowe's credentials, parties stated, "[Defendants' attorney:] At this time I would like to offer Mr. Nowe as an expert as a bank examiner[. Plaintiffs' attorney:] No objection, Your Honor.").

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity . . . ; or

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity[.]

N.J. Stat. § 34:19-3(a)(1)–(2).

New Jersey courts have established the following as the elements of a

CEPA claim:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19–3[(a)];

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015) (citations omitted); *see also Hitesman v. Bridgeway*, 93 A.3d 306, 318–19 (N.J. 2014) (broadening second element to include whistle-blowing activity "as defined in N.J.S.A. 34:19–3(a) or (c)[.]").

- 14 -

The Plaintiffs argue Nowe's testimony was irrelevant to the first element, under which a plaintiff "must set forth facts which would support an objectively reasonable belief that a violation has occurred." ***Dzwonar v. McDevitt***, 828 A.2d 893, 901 (N.J. 2003). We agree. The Defendants lacked a foundation to introduce expert testimony related to the first element as they did not elicit testimony regarding the Plaintiffs' beliefs. ***See*** N.T. Trial, 3/1/19, at 529–30 ("There's been no foundation laid that [the Plaintiffs] were aware of the banking regulations[.]").

Judge Guido, however, permitted Nowe's testimony for the purpose of disputing the fourth element—the existence of a causal connection between the Plaintiffs' threats to expose ACBB and their firing at the board's hands.[15]

---

[15] The Plaintiffs highlight Judge Guido's ruling, which revised the permissible scope of Nowe's testimony mid-trial. Brief of Appellant, at 22–23. They, however, do not assert this ruling was error. ***See id.*** (discussing Judge Guido's "inability to settle on a reason for admitting [] Nowe's expert opinion" without alleging error). Though the court's ruling was unusual, it was not impermissible. ***See Morgan v. Petroleum Products Equipment Co.***, 92 A.3d 823, 827 (Pa. Super. 2014) (holding "[a] trial judge . . . always may revisit his or her own pre-trial rulings in a case without clashing with the law of the case doctrine[.]"); ***see also Key Automotive Equipment Specialists, Inc. v. Abernethy***, 636 A.2d 1126, 1128 (Pa. Super. 1994) ("It is well[-]settled that a trial court has the inherent power to reconsider its own rulings."). Moreover, both the original and revised scope of Nowe's testimony drew from the same two-paragraph section of his expert report, thus blunting any surprise or prejudice which could have undermined the Plaintiffs' case. ***See Brady v. Ballay Thornon, Maloney Medical Associates, Inc.***, 704 A.2d 1076, 1082 (Pa. Super. 1997) (finding neither prejudice nor unfair surprise where expert's testimony exceeded scope of pre-trial report because the "discrepancy between the expert's pre-trial report and his trial testimony was not of a nature that would have prevented [the plaintiffs] from preparing

*See id.* at 530 ("[Nowe] can legitimately testify that no one with knowledge of banking regulations would be concerned about the report, and that goes to the issue of whether or not the actions were retaliatory."). Under New Jersey law, a "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." *See Romano v. Brown & Williams*, 665 A.2d 1139, 1142–43 (N.J. Super. App. Div. 1995). If an employer can "produce evidence showing a legitimate, nondiscriminatory reason for the discharge . . . the employee . . . must show that the employer's proffered explanation is incredible." *Fleming v. Correctional Healthcare Solutions*, *Inc.*, 751 A.2d 1035, 1041 (N.J. 2000).

The Defendants assert the Plaintiffs were not fired in connection with their threats to inform regulators of the changes to the BITS operating agreement; rather, they assert the board unanimously decided to fire the Plaintiffs for insubordination after they meddled in the board's affairs by demanding the resignation of one of its members. *See* N.T. Trial, 2/28/19, at 498 ("[T]his issue of getting rid of Mitch Wienick I thought was totally inappropriate and so inappropriate that it could potentially be cause for dismissal to have a senior executive of the company make a request or a demand like that[.]"). The Defendants offered Nowe's testimony to prove the Plaintiffs' threats were "nonsensical." N.T. Trial, 3/1/19, at 529; *see also id.*

a meaningful response, or which would have misled them as to the nature of the appropriate response.").

at 560 ("[Evans] said, Chuck, this isn't the role of the regulators.  This isn't .

. . in their bailiwick.").

> Nowe testified as follows:
>
> Q[:]  Now, do you have an opinion of whether the bank regulators would have . . . any issue with the amendment or the operating agreement?
>
> A[:]  In my opinion, looking at the operating agreement and the way it was structured, the operating agreement did not change the basic premise of what the operating of BITS was or is . . . to this date, and so it did not in any way change what its fundamental purpose was.
> . . .
>
> Q[:]  Is a regulator concerned about the internal operations or management of a financial institution like you reviewed with this amended operating agreement of BITS?
>
> A[:]  The regulator[ is] concern[ed] with the internal operations of a financial institution only to the extent that those operations create an unsound and unsafe condition to the financial institution itself.
>
> Q[:]  And did the change in the operating agreement that you reviewed create any unsafe or unsound operation?
>
> A[:]  No, the changes, as I reviewed them and as I understood them, to be really within the normal operations and how day-to-day operations would be occurring, *and the regulator is typically not involved in the day-to-day operations of the financial institution and regulating that. That's the responsibility of the board and management.*

N.T. Trial, 3/1/18, at 535–36 (emphasis added).

Nowe's testimony speaks directly to the lack of seriousness with which

a regulator would view the Plaintiffs' oft-threatened report.  ***See*** N.T. Trial,

3/1/18, at 536 (stating matters concerning amendment to BITS operating

agreement would not concern regulators). It also gives context to the Defendants, as individuals with knowledge of regulatory practices, having a nonplussed reaction to the Plaintiffs' threats, thus, bearing on whether "a causal connection exist[ed] between the whistle-blowing activity and the adverse employment claim." *Lippman*, *supra* at 226. Nowe's testimony plainly exceeds the requirement for evidence to possess "any tendency to make a fact of consequence more or less probable[.]" *Mitchell*, *supra* at 314. Consequently, we cannot say that the lower court manifestly abused its discretion or committed an error of law. *B.K. v. J.K.*, *supra*, at 991–92.

In their second claim, the Plaintiffs contend Nowe's testimony was confusing, misleading, and prejudicial. Brief of Appellants, at 24. They do not cite a single case in support of this proposition, other than to define "unfair prejudice". *See id.*, at 25 (citing *Commonwealth v. Kane*, 138 A.3d 1217, 1288 (Pa. Super. 2018)). We, therefore, consider the Plaintiffs' second claim waived. *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) ("[Arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention.") (citations omitted); *see also In re Child M.* 681 A.2d 793, 799 (Pa. Super. 1996) ("[T]he 'argument' section of an appellate brief must contain a full discussion of the points raised accompanied by citation to pertinent authority.") (citing Pa.R.A.P. 2119(a)).

The Plaintiffs' third claim contends the trial court erred by precluding evidence of the Defendants' fraudulent conduct. *See* Brief of Appellants, at 6, 28–30. In this poorly-articulated claim, the Plaintiffs assert the court broadly hampered their ability to present evidence pertinent to the Defendants' ostensibly fraudulent conduct. *Id.* at 30. They, however, only reference a single sustained objection from Nowe's cross-examination. *Id.* Consequently, we limit our review to the court's decision to sustain that objection. *See Keller v. Mey*, 67 A.3d 1, 7 (Pa. Super. 2013) ("This Court will not develop arguments on the behalf of an appellant or comb the record for factual underpinnings to support an appellant's position.").

The Plaintiffs reference the following exchange:

Q. And would the regulators have been interested if it was reported to them that a change in the operating agreement constituted a fraud on the employees?

Mr. Crocenzi:[16] Objection, Your Honor.

The Court: Sustained.

*Id.* at 30 (citing N.T. Trial, 3/1/18, at 537).

Any argument regarding the court's preclusion of fraud-related evidence vis-à-vis the above-referenced sustained objection is fatally undermined by the fact that Daniels and Dalvi stipulated to the legality of the December 29, 2010 amendment to the operating agreement. *See* N.T. Trial, 2/28/18, at

---

[16] Michael J. Crocenzi, Esquire, served as trial counsel for the Plaintiffs. N.T. Trial, 2/26/18, at 1.

519 ("The Court: [T]he parties have agreed that . . . the operating agreement was legally amended for proper tax purposes."); *see also Mader v. Duquesne Light Company*, 199 A.3d 1258, 1264 (Pa. Super. 2018) ("[S]tipulations are binding upon the court as well as on parties agreeing to them."). Consequently, the Plaintiffs' question can only be interpreted as either an impermissible inference regarding a fraudulent purpose behind the 2010 amendment, or as speculative inquiry into whether a hypothetical, fraudulent change to the operating agreement would draw regulatory interest. *See Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 850 (Pa. Super. 2012) ("[E]xpert testimony is incompetent if it lacks an adequate basis in fact. . . . This means that expert testimony cannot be based solely upon conjecture or surmise."). Therefore, the court did not abuse its discretion or commit an error of law in sustaining the Defendants' objection. *B.K. v. J.K.*, *supra* at 991–92.

The Plaintiffs' fourth claim asserts the trial court erred by refusing to charge the jury with deciding whether, under CEPA, the Plaintiffs held a reasonable belief that the Defendants were defrauding BITS members. Brief of Appellant, at 6.

We apply the following standard to the Plaintiffs' claim:

In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law

which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal.

*Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted).

Preliminarily, we first examine the court's responsibilities under CEPA. CEPA, *inter alia*, prohibits an employer from taking retaliatory action against an employee for threatening to disclose conduct "the employee reasonably believes . . . is fraudulent . . . including any activity . . . which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity[.]" N.J. Stat. § 34:19-3(a)(2). CEPA claims under section 34:19-3(a)(2), such as the instant claim, require the fact-finder to evaluate "whether the employee making the complaint reasonably believed that the activity was occurring and that it amounted to fraud." *Battaglia v. United Parcel Service, Inc.*, 70 A.3d 602, 626 (N.J. 2013). "At the same time, as [the Supreme Court of New Jersey has] cautioned, the court must be alert to the sufficiency of the factual evidence and to whether the acts complained of could support the finding that the complaining employee's belief

was a reasonable one." *Id.* "Vague and conclusory complaints . . . are not the sort of things that the [New Jersey] legislature intended to be protected by CEPA." *Id.* at 627.

In *Dzwonar v. McDevitt*, 828 A.2d 893 (N.J. 2014), the New Jersey Supreme Court explained the interplay between a plaintiff's burden under CEPA and the trial court's gatekeeping role as follows:

> [A] Plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.

*Id.* at 901–902 (requiring trial judge make substantial nexus threshold determination under section 34:19–3(c) of CEPA); *see also Hitesman*, *supra* at 318–19 (N.J. 2014) (extending threshold determination required by *Dzwonar* to claims, such as Plaintiffs', under section 34:19–3(a)).

"The statutory elements and the analytical framework set forth in *Dzwonar* distinguish an employee's objection to, or reporting of, an employer's illegal or unethical conduct from a routine dispute in the workplace regarding the relative merits of internal policies and procedures." *Hitesman*, *supra* at 319 (citing *Dzwonar*, *supra* at 903 (finding plaintiffs, as matter of law, did not possess objectively reasonable belief that defendant's conduct violated law where complaint only alleged inadequate explanation of union's

actions to membership) and ***Maw v. Advanced Clinical Communications***, 846 A.2d 604, 608 (N.J. 2004) (rejecting claim as unreasonable where plaintiff contested terms of non-compete clause on grounds that "plaintiff's dispute with her employer is private in nature.")).

In the instant matter, the court excised any mention of the Plaintiffs' fraud-related CEPA claim from the verdict slip after the following exchange:

> The [c]ourt: [] I had submitted a draft of a verdict slip[.] I originally in number two had in there whether the Plaintiffs reasonably believed that the change of the operating agreement in 2010 perpetrated a fraud upon the employees of BITS.
>
> And based upon the testimony that I heard that the Plaintiffs were—not only were the Plaintiffs aware of the operating agreement, but that they felt all of the employees were aware that the operating agreement would be changed, but it would have to be reported to the regulators, the issue of fraud is out.
>
> The only issue is whether or not the change—whether they reasonable believed that the change must legally be reported to the regulators or be in violation of the letter of non-objection.
>
> Ms. Diulus-Meyers:[17] Your Honor, I believe that the testimony was that they knew it could be changed, but it couldn't be changed in all respects. And . . . it couldn't just be changed . . . to defraud the shareholders.
>
> The [c]ourt: There could be no defrauding of the shareholders unless they had a justifiable reliance on what was in the operating agreement. The testimony was that they felt the shareholders knew that the operating agreement could be changed; therefore there was *no possible fraud* upon the shareholders.

N.T. Trial, 2/28/18, 521–22 (emphasis added).

---

[17] Patricia Diulus-Meyers, Esquire, served as trial counsel for the Plaintiffs. N.T. Trial, 2/26/18, at 1.

The Plaintiffs assert "[w]hether Plaintiffs had a reasonable belief that shareholders were being defrauded is a question of fact which should have been submitted to the jury but was instead dismissed by the [c]ourt as a matter of law." Brief of Appellants, at 33. This assertion runs contrary to established New Jersey case law. *See Dzwonar*, *supra* at 901 ("the trial court *must* make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy[.]") (emphasis added).

Judge Guido did not find a substantial nexus between the complained of conduct and fraud because the plaintiffs never presented any evidence of fraudulent conduct. *See* Pa.R.A.P. 1925(a) Opinion, 11/20/18, at 7 ("The . . . changes to [the] [o]perating [a]greement . . . were never said to be made fraudulently. Instead, it was presented that the changes were done by the book, openly and in accordance with [the] governing terms of the [o]perating [a]greement. Furthermore, the Plaintiffs' own employment contracts anticipated that such changes might be made[.]").

Upon careful review of the record, we find the trial court's refusal to instruct the jury on the Plaintiffs' fraud-related CEPA claim to be a proper exercise of its gatekeeping function under *Dzwonar* and its progeny. *Dzwonar*, *supra* at 901. We acknowledge the Plaintiffs are not required to prove each element contained within "the legal definition of fraud." *Battaglia*, *supra* at 626. They, however, must allege conduct which bears

some resemblance to fraud, which under any definition—even a lay definition—would require some sort of misrepresentation. **Compare Allstate New Jersey Ins. Co. v. Lajara**, 117 A.3d 1221, 1231 (N.J. 2015) (defining fraud under New Jersey law as "(1) *a material misrepresentation* of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages") (emphasis added); **with** Black's Law Dictionary (11th ed. 2019) (fraud) ("*A knowing misrepresentation* or knowing concealment of a material fact made to induce another to act to his or her detriment") (emphasis added) **and** Merriam-Webster, https://www.merriam-webster.com/dictionary/fraud (last visited August 14, 2018) ("Deceit, trickery[;] specifically: *intentional perversion of the truth* in order to induce another to part with something of value or to surrender a legal right.") (emphasis added).

The evidence offered at trial—in particular, the original BITS operating agreement, the Plaintiffs' employment agreements, the Plaintiffs' own trial testimony,[18] and the stipulation concerning the methods and purposes

_____

[18] We find the following testimony, elicited during Dalvi's cross-examination, particularly instructive:

> Q. Mr. Dalvi, isn't it true that the operating agreement could be amended at any time by a supermajority of the membership unit holders?

underpinning the amendment to the operating agreement—fails to hint at conduct which could possibly be viewed as misrepresentative. **See** Operating Agreement, 3/1/05, at 6 (requiring supermajority vote for approval of certain decisions by managing member, including decisions to restructure BITS, incur indebtedness outside ordinary course, or *amend operating agreement*); **see also** Daniels' Employment Agreement, 2/23/05, at 3 (allowing Daniels to invoke constructive termination "as a direct result of . . . an amendment[] to . . . the [o]perating [a]greement[] that permits the [m]anaging [m]ember to increase the amount of [BITS'] annual [n]et [i]ncome . . . the [m]anaging [m]ember may add to [BITS'] reserves in any year to more than ten percent . . . of [BITS'] annual [n]et income[.]"); **and** Dalvi's Employment Agreement, 3/1/05, at 2–3 (containing same constructive termination clause); **and** N.T.

_____

A.  Yes it could[.]

Q. And so when you entered into this employment [agreement] with BITS you knew that the operating agreement could be changed correct?

A.  I knew it could be changed[.]

Q.  And so if [every owner of B and C membership units] had a copy [of the operating agreement] and they could read it, they could see in there that it could be changed at any time, correct?

A.  Operating agreement can be changed at any time [sic].

N.T. Trial, 2/28/18, at 453–54.

Trial, 2/28/18, at 520 (outlining parties' stipulation to legal and proper purposes behind amendment to operating agreement).

The trial court's decision to omit a requested jury instruction is adequate "unless . . . there is an omission which is tantamount to fundamental error." *Sandusky*, *supra* at 667. We cannot say, under the instant circumstances, that Judge Guido committed fundamental error by exercising the gatekeeping function required of him under New Jersey law. *See Dzwonar*, *supra* at 901–02; *see also Hitesman*, *supra* at 318–19 (N.J. 2014). As such, we cannot grant relief. *Sandusky*, *supra* at 667.

In their final claim, the Plaintiffs' assert Judge Peck erred by granting the Defendants' motion for summary judgment as to the Plaintiffs' unjust enrichment claim. Brief of Appellant, at 7.

We review this claim under the following, well-established principles:

> [O]ur scope of review is plenary, and our standard of review is the same as that applied by the trial court[. A]n appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo*.

> Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a

fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Reinoso v. Heritage Warminster SPE LLC*, 108 A.3d 80, 84 (Pa. Super. 2015).

The Plaintiffs assert the court below erred in dismissing their claim for unjust enrichment during summary judgment. Brief of Appellant, at 35. Unjust enrichment is an action sounding in quasi-contract or contract implied in law. *Sevast v. Kakouras*, 915 A.2d 1147, 1153 n.7 (Pa. 2007) (citing *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 449 (Pa. 1969)). "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *Gutteridge v. J3 Energy Group, Inc.*, 165 A.3d 908, 917 (Pa. Super. 2017) (en banc). The doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded on a written agreement or an express contract. *Roman Mosaic & Tile v. Vollrath*, 143 A.3d 421, 428 (Pa. Super. 2017).

The elements of unjust enrichment are: "[(1)] benefits conferred on defendant by plaintiff[; (2)] appreciation of such benefits by defendant[;] and [(3)] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *WFIC, LLC v. LaBarre*, 148 A.3d 812, 819 (Pa. Super. 2016) (citation omitted). "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or

passively received a benefit it would be unconscionable . . . to retain."

***Gutteridge***, ***supra*** at 917. The doctrine's application depends on the particular circumstances of each case, with the Court's focus primarily on "whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefitted as a result of the actions of the plaintiff." ***Id.***

In deciding the case below, Judge Peck dismissed the case on the following grounds: (1) "[t]he plaintiffs were dismissed . . . according to the terms of their employment agreement[;]" and (2) "[the] Plaintiffs [did] not adduce evidence that they have been *directly* injured by defendants unjustly." Pa.R.A.P. 1925(a) Opinion, 7/6/17, at 17 (emphasis added). Neither is an appropriate basis for granting summary judgment.

The first basis for dismissal, the relationship formed by the employment agreements, failed to account for the fact that the contractual relationship contained in the Plaintiffs' respective employment agreements exists between the Plaintiffs and BITS, not the Plaintiffs and the Defendants. ***See*** Daniels' Employment Agreement, 2/23/05, at 1 ("This [e]mployment [a]greement is entered into by and between Charles P. Daniels and ACBB-BITS, LLC"); ***see also*** Dalvi's Employment Agreement, 3/1/05, at 1 ("This [e]mployment [a]greement is entered into by and between Imran Dalvi and ACBB-BITS, LLC"). As such, the employment agreements cannot serve as the basis for

dismissing the Plaintiffs' unjust enrichment claim.[19]  *See Roman Mosaic & Tile*, *supra* at 428 (requiring dismissal in presence of "a written agreement or an express contract"); *see also Gutteridge*, *supra* at 917 (imposing a duty under quasi-contract "in . . . the absence of an agreement").

The second rationale for dismissing the instant claim states the Plaintiffs did not "adduce evidence that they have been directly injured by Defendants unjustly[,]" on the grounds that, "[a]ny indirect injury . . . by the conduct of the defendants is not sufficient to [mete] out a claim for unjust enrichment." Pa.R.A.P. 1925(a) Opinion, 7/6/17, at 17 (citing generally *Hill v. Ofalt*, 85

---

[19] We previously held the Plaintiffs' unjust enrichment claim arose under the BITS operating agreement, not the Plaintiffs' employment agreements, stating as follows:

> The unjust enrichment claim alleges that ACBB diverted profits to itself that should have gone to BITS and its executives, under the *operating agreement* between ACBB and BITS.  While this claim involves the operating agreement, it clearly does not involve a dispute or controversy arising out of or related to *the employment agreements* or any claimed breach thereof. . . . Nor does this count implicate Evans since he does not possess any rights or duties under the employment agreements.

*Atlantic Community Bankers Bank, Inc. v. Daniels*, 635 MDA 2014 (Pa. Super. March 18, 2015) (unpublished memorandum) (emphasis in original). We note neither the operating agreement between BITS and ACBB nor the Plaintiffs' employment agreements with BITS serves as a written or express agreement between the opposing parties; consequently neither agreement serves as a basis for dismissal.  *Roman Mosaic & Tile*, *supra* at 428.

A.3d 540 (Pa. Super. 2013)).[20]   The direct or indirect cause of a plaintiff's injury may be material to an unjust enrichment claim insofar as it bears on whether enrichment was unjust; however, in and of itself, indirectness is an insufficient basis for dismissal.  *Gutteridge*, *supra* at 917 (allowing unjust enrichment claims where defendant either "wrongfully secured *or passively received* a benefit[.]") (emphasis added).

We, nonetheless, affirm the court's order granting summary judgment. *See Plasticert, Inc. v. Westfield Ins. Co.*, 923 A.2d 489, 492 (Pa. Super. 2007) ("[W]e may affirm the trial court's order on any valid basis.").  Our review of the record before Judge Peck reveals no genuine issues as to any material fact.[21]  Moreover, we find, as a matter of law, that the Plaintiffs failed to offer evidence supporting the most critical aspect of their claim—that Defendants' enrichment was unjust.  *Gutteridge*, *supra* at 917; *see also*

---

[20] Though **Hill** mentions an unjust enrichment claim, the case itself concerns the lower court sustaining a demurrer to a complaint, which this Court subsequently affirmed on the basis that the plaintiff lacked standing to pursue a shareholder strike suit.  *See Hill*, *supra* at 548 (evaluating shareholder's standing to sue under 15 Pa.C.S.A. § 1717).  As such, **Hill** is of not relevant to the matter at issue.

[21] The Plaintiffs generally allege unjust enrichment claims are dependent on "the particular factual circumstances . . . [and a]s such [are] not typically amenable to disposition on summary judgment[,]" but they do not allege any specific dispute of material fact.  *See* Brief of Appellant, at 37 (citing *Grill v. Aversa*, 2014 WL 4672461, at 11 (M.D. Pa. 2014)).  Their reliance on non-binding, unreported case law is unavailing.  *See, e.g., Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006) ("Appellant's quasi-contract claim was properly dismissed on summary judment[.]").

***Stoeckinger v. Presidential Financial Corp. of Delaware Valley***, 948 A.2d 828, 834 (Pa. Super. 2008) (affirming grant of summary judgment dismissing unjust enrichment claim on grounds "that as a matter of law, [Appellant] failed to show that [Appellee's actions were] unjust.").

To prevail on their claim, the Plaintiffs needed to show that the Defendants "wrongly secured or passively received a benefit that would be unconscionable to retain." ***Babich v. Karsnak***, 528 A.2d 649, 652–53 (Pa. Super. 1987) (finding record supported summary judgment where any benefit conferred upon corporate defendants was "incidental to [the plaintiff] pursuing his own."); ***see Stoeckinger***, ***supra*** at 834 (concluding bank acting pursuant to preexisting loan agreement precluded finding that bank's actions were unjust); ***see also Meyers Plumbing and Heating Supply Co. v. West End Federal Sav. and Loan Ass'n***, 498 A.2d 966, 970 (Pa. Super. 1985) ("A necessary element of unjust enrichment is that a benefit must have been conferred for which no compensation was given.").

It is uncontested that the operating agreement, by its own terms, could be amended. ***See*** Brief of Appellant, at 40 ("Plaintiffs acknowledge that ACBB and Evans had the authority to amend the [o]perating [a]greement. This authority is stated in the [o]perating [a]greement itself."). The Plaintiffs' original employment agreements accounted for the possibility that the operating agreement would be altered to decrease the annual distributions of BITS' net income below ninety percent. ***See*** Daniels' Employment Agreement,

2/23/05, at 3 (stating constructive termination contingencies); ***see also*** Dalvi's Employment Agreement, 3/1/05, at 2–3 (stating same constructive termination contingencies). When this contingency came to pass, after years of work to build BITS into a profitable business, the Plaintiffs exercised their constructive termination clauses—an event which the Plaintiffs knew would both entitle them to substantial compensation and require them to relinquish their membership units. ***See*** Daniels' Employment Agreement, 2/23/05, at 12 (requiring: (1) BITS compensate Daniels for six months; and (2) Daniels sell back all Class B membership units within four years); ***see also*** Dalvi's Employment Agreement, 2/23/05, at 12 (stating identical requirements).

The relationship described above does not, as a matter of law, allow the Court to impose quasi-contractual relief, as even construed in the light most favorable to the Plaintiffs, where there are no facts upon which to find the Defendants unconscionably retained any benefit from the Plaintiffs' services. ***See Gutteridge***, ***supra*** at 917; ***see also Babich***, ***supra*** at 652–53; ***and see Stoeckinger***, ***supra*** at 834. As such, the Plaintiffs' final claim fails.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/10/2019

- 33 -