J-A29024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| CENTIMARK CORPORATION D/B/A/ QUESTMARK, A DIVISION OF CENTIMARK | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GRAND ESSEX LLC; JERSEY GLATT, INC., COLLECTIVELY D/B/A GRAND & ESSEX MARKET | : | No. 613 WDA 2025 |
| | : | |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered May 2, 2025
In the Court of Common Pleas of Washington County Civil Division at
No(s):  2022-7209

BEFORE:  OLSON, J., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                   **FILED: April 21, 2026**

Appellant, Grand Essex LLC and Jersey Glatt, Inc., collectively doing business as Grand & Essex Market, (collectively, "Grand & Essex Market") appeals from the May 2, 2025 judgment entered in the Court of Common Pleas of Washington County upon a non-jury verdict in favor of Centimark Corporation doing business as QuestMark, a division of Centimark, (collectively, "QuestMark") on QuestMark's breach of contract claim.  Upon careful review, we affirm.

The trial court summarized the procedural and factual history as follows:

[Grand & Essex Market] is a grocery store located in Bergenfield, New Jersey.  [QuestMark and Grand & Essex Market] entered into a contract in which [QuestMark agreed to] remove existing flooring in the store and lay a new Tru PC product onto the existing

concrete [sub-floor]. On October [26], 2022, [QuestMark] filed a *writ* of summons against [Grand & Essex Market] for which a complaint was filed on December [19], 2022. [QuestMark's] complaint alleges one count of breach of contract in that [Grand & Essex Market] failed to provide payment for work completed under the contract. [Grand & Essex Market] filed an answer denying a breach [of contract,] claiming [QuestMark] failed to complete the work in a good and workmanlike manner. The matter proceeded to a non-jury trial on October [30], 2024[.]

After consideration of the testimony provided at the non-jury trial, [the trial] court issued its findings and verdict on November [6], 2024. On November [15], 2024, [Grand & Essex Market] filed a motion for post[-]trial relief. A hearing on [Grand & Essex Market's] post[-]trial motion was originally scheduled for January [14], 2025, but was rescheduled by motion from [Grand & Essex Market] to March [31], 2025. On April [16], 2025, [the trial] court issued an order denying [Grand & Essex Market's] motion for post[-]trial relief.

Trial Court Opinion, 7/21/25, at 1-2 (extraneous capitalization omitted).

On May 2, 2025, QuestMark filed a *praecipe* for entry of judgment. That same day, May 2, 2025, judgment was entered in favor of QuestMark and against Grand & Essex Market in the amount of $86,252.00. This appeal followed.[1]

Grand & Essex Market raises the following issues for our review:

1.  Whether the trial court ignored the evidence that [QuestMark] breached the contract by creating a floor with defects[?]

2.  Whether the trial court erred in its determination of damages beyond the monies owed by [Grand & Essex Market] on the contract[?]

---

[1] Grand & Essex Market and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

3. Whether the trial court erred in not allowing deposition testimony of [Grand & Essex Market's] representative to be admitted at trial[?]

Grand & Essex Market's Brief at 2.

In its first issue, Grand & Essex Market challenges the non-jury verdict in favor of QuestMark. Grand & Essex Market asserts that the trial court erred in finding that Grand & Essex Market failed to prove the affirmative defense that QuestMark breached the contract by failing to perform the work in a good and workmanlike manner and, therefore, Grand & Essex Market was not obligated to make final payment under the sales agreement. *Id.* at 5-6.

Our standard and scope of review in an appeal from a judgment entered on a non-jury verdict

> is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial [court] must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*J.J. DeLuca, Co., Inc. v. Toll Naval Associates*, 56 A.3d 402, 410 (Pa. Super. 2012) (citation omitted). "We will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the [trial] court's determination was manifestly erroneous, arbitrary and capricious[,] or flagrantly contrary to the evidence." *Id.*, *citing Ecksel v. Orleans Constr. Co.*, 519 A.2d 1021, 1028 (Pa. Super. 1987).

"To show a breach of contract, a party must prove: (1) the existence of a contract, including its essential terms; (2) a breach of the duty imposed by the contract; and (3) resultant damages." *Centric Bank v. Sciore*, 348 A.3d 1089, 1105 (Pa. Super. 2025). It is well-established that "[w]here skill, as well as care[,] is required in performing the undertaking, if the party purport[s] to have skill in the business, and he [or she] undertakes for hire, he [or she] is bound to the exercise of due and ordinary skill in the employment of his [or her] art or business about it, or, in other words, to perform it in a workmanlike manner." *Waugh v. Shunk*, 20 Pa 130, 133, 1852 WL 5937, at *4 (Pa. 1852); *see also Mort Co. v. Paul*, 76 A.2d 445, 447 (Pa. Super. 1950); *Latona Trucking, Inc. v. E.R. Linde Constr. Corp.*, 350 A.3d 127, 2025 WL 2795886, at *3 (Pa. Super. filed Oct. 1, 2025) (unpublished memorandum). Thus, where a skilled provider enters into a contract to provide a skill or service, the service provider will have breached the contract if the service provider failed to perform the work in a good and workmanlike manner.

Here, Grand & Essex Market asserts that "the evidence is clear that QuestMark breached the contract by failing to deliver a product free of defects." Grand & Essex Market's Brief at 5. Grand & Essex Market contends that QuestMark's representative, Greg Wagner ("Mr. Wagner") admitted, during his testimony, that QuestMark caused the defects in Grand & Essex Market's floor and, despite an attempt to fix the defects, "left [Grand & Essex Market] with issues in the floor." *Id.* at 6. Grand & Essex Market argues that

the trial court "ignored evidence that QuestMark breached the contract by failing to perform the work in a good and workmanlike manner." *Id.*

The trial court explained its decision as follows:

Here, [the trial] court found that [Mr. Wagner, the] project manager for [QuestMark,] testified credibly that there was nothing in the specifications of the proposal indicating that [QuestMark] was going to level the floors or repair defects in the existing floor. Additionally, [the trial] court reviewed the proposal and sales agreements and found no evidence of any promises made by [QuestMark] to cure existing defects in the concrete subfloor. Further, [the trial] court found that the complaints made by [Grand & Essex Market] regarding the low spots are in regard to [a] ten to 12 [square foot area] in a 6,730 [square foot] project.

Regarding coloring, [the trial] court found credible [Mr. Wagner's] testimony that the difference in coloring in the undyed sections of the flooring is due to improper cleaning in the older section of floor. Finally, regarding the variations in aggregate, [the trial] court found credible [Mr. Wagner's] testimony that the variation in aggregate isn't something that [QuestMark] can control and it just depends on how the aggregate falls when poured. Ultimately, after considering all of the evidence, [the trial] court found that [QuestMark] did not breach any duty imposed [] by the contract.

Trial Court Opinion, 7/21/25, at 3 (extraneous capitalization omitted).

Upon review, we concur with the trial court, and the record supports, that Grand & Essex Market failed to establish, as an affirmative defense, that QuestMark breached the sales agreement by providing defective flooring, thereby, relieving Grand & Essex Market from its obligation to make final payment under the terms of the sales agreement. Mr. Wagner testified that the scope of QuestMark's work and duties owed to Grand & Essex Market was set forth in the proposal and sales agreement. N.T., 10/30/24, at 27; *see also* QuestMark Exhibit 7 (stating, "[t]he scope of the work is limited to what

is stated in the proposal and sales agreement unless specifically stated otherwise" (extraneous capitalization omitted)). The proposal detailed the scope of the work to be performed. *See* QuestMark Exhibit 6. The sales agreement described the "description of the work" as "*per* proposal dated 12-21-21 and/or as follows: Phase 2 Overlay and Polish[.]" QuestMark Exhibit 7.

QuestMark summarized Grand & Essex Market's dissatisfaction, and, therefore, Grand & Essex Markey's reason for failing to make final payment for the work performed, as: (1) "dips/potholes/bumps" in the flooring, (2) cracks in the flooring, and (3) the look and aesthetics of the flooring, especially involving an area of the flooring where the aggregate was more pronounced. N.T., 10/30/24, at 114. Mr. Wagner testified that the "dips/potholes/bumps" referred to approximately ten to twelve "low spots" throughout the entire area of the floor which could be noticed when a shopping cart rolled over them. *Id.* at 37, 55. Mr. Wagner described the Tru PC flooring as "a cementitious concrete that is poured out at 3/8 of an inch and allowed to dry . . . it's like a topping[,] a microtopping on top of the concrete [sub-floor]." *Id.* at 20-21. Mr. Wagner stated that the Tru PC flooring is not "a leveling product" for purpose of leveling the concrete sub-floor. *Id.* at 21. Mr. Wagner explained that the Tru PC flooring was installed on top of the concrete sub-floor and "follow[ed] the contour of the [sub-]floor." *Id.* at 21, 35. He further explained that if the concrete sub-floor was uneven, it affected the final appearance of the Tru PC flooring because the unevenness of the sub-floor would be

"telegraphed all the way up through [the Tru PC flooring] that's on top of [the sub-floor]." *Id.* at 36. Mr. Wagner explained that, in any project involving the installation of a Tru PC floor, QuestMark was not responsible for the concrete sub-floor being uneven, and leveling an uneven floor, if one existed, was not typically within the scope of work performed by QuestMark. *Id.* at 35-36. Mr. Wagner stated that if a customer wanted QuestMark to level an uneven floor, such a task would be considered "an extra," meaning that it would fall outside the normal scope of work, under the terms of the sales agreement, performed by QuestMark when installing a Tru PC floor. *Id.* at 36. The scope of the work, as set forth in the sales agreement and proposal, did not indicate that QuestMark would level Grand & Essex Market's existing concrete sub-floor that was located beneath the Tru PC flooring material that was installed by QuestMark. *See* QuestMark Exhibits 6 and 7.

With regard to the appearance of "cracking" in the Tru PC flooring, Mr. Wagner explained that when installers pour concrete, a joint is cut in the slab to prevent cracking because concrete, as it cures, will occasionally crack. *Id.* at 26. Mr. Wagner stated that the proposal contained a paragraph explaining that

> Expansion joints are part of all concrete floors. They are intended to enable the concrete to expand or contract based on a variety of external forces. You may experience hairline cracks [] in our proposed system [(referring to the Tru PC flooring)]. This is not considered a failure and is not covered under QuestMark's warranty policy.

*Id.*; *see also* QuestMark Exhibit 6. Mr. Wagner testified that one hairline crack in the Tru PC flooring appeared in a photograph that was entered as QuestMark Exhibit 14-B.

Mr. Wagner agreed that the dissatisfaction with the pronouncement of the aggregate in the Tru PC flooring referred to the "salt and pepper" look of the aggregate where it appeared that there was more aggregate present in some areas (the "pepper") while other areas appeared to have no aggregate present (the "salt"). *Id.* at 57. Mr. Wagner explained that QuestMark cannot "guarantee where the aggregate sits in the floor" and there is nothing that can be done during the installation process to control an even disbursement of aggregate throughout the Tru PC flooring. *Id.* at 40.

As the trial court found, and the record supports, Grand & Essex Market failed to demonstrate, at trial, that QuestMark breached the contract by failing to perform the scope of work as detailed in the sales agreement. As per the sales agreement, QuestMark was not responsible for leveling the sub-floor. The possibility of the development of hairline cracks in the Tru PC flooring was expressly disclosed in the sales agreement as a potential result of the curing process. Finally, through the process by which the Tru PC flooring is installed and finished, QuestMark was unable to control the disbursement of the aggregate throughout the flooring. We find sufficient evidence in the record to support the trial court's finding that Grand & Essex Market failed to prove

that QuestMark breached the contract, thereby providing Grand & Essex Market an affirmative defense.[2]

Grand & Essex Market's second issue challenges the trial court's award of damages. In particular, Grand & Essex Market claims that the trial court erred in awarding damages beyond the amount due on the contract for the services provided. In reviewing Grand & Essex Market's claim, we employ the same standard of review as set forth *supra*. In other words, we review the trial court's award of damages to determine if the damage award is supported by competent evidence and whether the trial court erred in its application of the law. **J.J. DeLuca**, 56 A.3d at 410.

Grand & Essex Market challenges the trial court's award of 18% interest on the balance due under the terms of the sales agreement. Grand & Essex Market's Brief at 7. With little analysis or citation to controlling precedent, Grand & Essex Market baldly and conclusively asserts that "the contract clause [relating to damages] is unconscionable and [QuestMark] relies on preprinted boilerplate terms to support the extra damages [in the form of an award for interest]." **Id.** Grand & Essex Market contends that the "parties never

---

[2] To the extent that Grand & Essex Market's argument invites this Court to do nothing more than reassess the credibility of Mr. Wagner and reweigh the evidence in an attempt to convince us to reach a result different than the one reached by the trial court as fact-finder, we decline Grand & Essex Market's invitation. **See Gutteridge v. J3 Energy Grp., Inc.**, 165 A.3d 908, 916 (Pa. Super. 2017) (stating, "[a]ssessments of credibility and conflicts in evidence are for the trial court to resolve[. T]his Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for [that] of the fact-finder" (citation omitted)).

discussed the interest and penalty terms" and that the terms were not negotiated. *Id.* Grand & Essex Market argues that the trial court erred in giving effect to "the boilerplate provisions" of the sales agreement. *Id.*

In awarding QuestMark damages in the amount of $86,252.00, which included an award of $36,690.00 for interest and service charges, the trial court explained,

> John Altvater [("Mr. Altvater")], vice president and group director for QuestMark's Eastern Division[,] testified that the principal balance of $49,562.00 was due thirty days past the completion of the work in January 2022. Mr. Altvater further testified to the service charge against any overdue amount[,] as well as 18% interest on 90% of the unpaid monies as set forth in the sales agreement. [Grand & Essex Market] put on no testimony or evidence to contradict the amount of damages under the contract and[,] therefore[,] the damages were undisputed.

Trial Court Opinion, 7/21/25, at 4 (footnotes omitted).

The "Investment Summary" section of the proposal stated that the terms were "one-third (1/3) of the contract price is due at the job start and the balance is due net thirty (30) upon job completion." QuestMark Exhibit 6. The "Proposal Notes & Responsibilities" section of the proposal further explained that

> [One-third] of the total cost of this project is due upon the acceptance of a purchase order as a booking deposit. All remaining amounts are due within 30 days of completion of the project. All payments due and unpaid, which are not being held pending resolution of any dispute, shall bear interest from the date the payment is due at the annual percentage rate (APR) of eighteen percent (18%). In the event of any dispute arising between the parties, the customer shall be entitled to withhold ten percent (10%) of the invoiced amount, regardless of the percentage of work in question.

- 10 -

*Id.* The sales agreement described the payment terms as "30 Net 30." QuestMark Exhibit 7, at 1. The sales agreement further stated

> Unless otherwise stipulated on the face herein, the payment terms covering this sales agreement are: [one-third] (1/3) down payment with balance due net 10 days from invoice. In the event purchaser fails to pay any balance when due; then the entire balance shall immediately be due and payable. A service charge of one percent (1%) per month will be added to all balances past due thirty days, except that if a lesser amount is mandated by any controlling law, then the rate shall prevail.

*Id.* at 2. (extraneous capitalization omitted). Fred Schonfeld, on behalf of Grand & Essex Market, signed the sales agreement on December 24, 2021, acknowledging, in pertinent part, that

> By my signature below, I certify that I have authority to bind the purchaser and have had the opportunity to review the terms of this agreement, including those set forth on the second page. On behalf of the purchaser, I understand and accept said terms and agree to be bound thereby[.]

*Id.* at 1.

Mr. Altvater testified that the balance due on the contract at the end of January 2022, when the work was completed, was $49,562.00. N.T., 10/30/24, at 96. He stated that this amount was due 30 days, thereafter. *Id.* Mr. Altvater also acknowledged that the terms of the contract included a provision for the assessment of a service charge on the unpaid balance, as well as an interest charge of 18% calculated on 90% of the unpaid balance. *Id.* at 96-97.

Upon review, we conclude that Grand & Essex Market's issue regarding the damages award lacks merit. Mr. Schonfeld, who was authorized to sign the sales agreement on behalf of Grand & Essex Market, acknowledged that he "had the opportunity to review the terms" of the sales agreement, and that, on behalf of Grand & Essex Market, he understood and accepted the terms of the agreement. *See* QuestMark, Exhibit 7, at 2. This was a contract between two sophisticated business entities which contained a penalty provision for failure to pay timely – a common provision in commercial contracts. Short of making bald statements that the sales agreement was unconscionable and contained boilerplate provisions, Grand & Essex Market failed to support its argument that the trial court erred in awarding damages beyond the amount owed. Hence, Grand & Essex Market's second issue merits no relief.[3]

_____

[3] We do note, however, that the trial court erred as a matter of law in awarding interest in the amount of 18% annually because this term was not made a part of the final sales agreement.

As noted, *supra*, the sales agreement confirmed "the purchase of the services and work described in the [proposal.]" Questmark Exhibit 7, at 2. The second page of the sales agreement stated that the terms require a one-third deposit with the balance due net 10 days from the invoice **unless otherwise stipulated on the face herein.** *Id.* (emphasis added). The "face" of the sales agreement (page 1), however, stated that the terms were "30 Net 30." Thus, pursuant to the terms on the "face" of the sales agreement, a 30 percent deposit of the total purchase price was due initially with the balance due 30 days after the completion of the work. *Id.* at 1. The second page of the sales agreement further included a penalty provision for late payment by charging a service charge of 1% per month "to all balances past [30] days." *Id.* at 2. The terms set forth on the face of the sales agreement did not contradict the

In its final issue, Grand & Essex Market challenges the trial court's evidentiary ruling to preclude Grand & Essex Market from offering into

---

service charge term set forth on the second page of the sales agreement. Therefore, the service charge term set forth on the second page of the sales agreement applied. As such, the trial court did not err in assessing a service charge in its damage calculation.

The sales agreement, however, did not include a provision pertaining to an interest charge, including the 18% interest rate set forth in the proposal, and the sales agreement did not expressly incorporate the payment terms outlined in the proposal. Rather, the sales agreement, as detailed *supra*, included certain terms that applied unless those terms contradicted the terms that appeared on the "face" of the sales agreement, in which case the terms on the face of the sales agreement controlled. **Id.** Therefore, because the interest charge was not made a part of the sales agreement, the trial court erred in assessing an interest charge as part of the damage award.

This issue, however, was not raised and preserved, by Grand & Essex Market in its post-trial motion before the trial court. Pa.R.A.P. 302(a) (stating, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); *see also Est. of Hicks v. Dana Cos., LLC*, 984 A.2d 943, 976 (Pa. Super. 2009) (stating, "[e]ven when a litigant files post-trial motions but fails to raise a certain issue, that issue is deemed waived for purposes of appellate review"), *appeal denied*, 19 A.3d 1051 (Pa. 2011); *Steiner v. Markel*, 968 A.2d 1253, 1256 (Pa. 2009) (stating, "an appellate court cannot reverse a trial court judgment on a basis that was not properly raised and preserved by the parties"). A review of the record reveals that, in support of its post-sentence motion, Grand & Essex Market asserted that "[t]he contract was a contract of adhesion and [QuestMark] relies on boilerplate terms to support the extra changes." Grand & Essex Market's Brief in Support of its Post-Trial Motion, 2/27/25, at 4. In other words, Grand & Essex Market does not dispute that the service charge and interest terms were part of the sales agreement but, rather, disputes that the terms were "boilerplate" and not negotiated by the parties and, therefore, should not be enforced. Because this issue was not properly preserved, we are required to affirm the judgment in the amount of $86,252.00, which includes interest charges.

evidence at trial excerpts from the deposition testimony of Grand & Essex Market's corporate designee, Aron Goldklang ("Mr. Goldklang").

> Admission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion[,] the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Schuenemann v. Dreemz, LLC*, 34 A.3d 94, 100-101 (Pa. Super. 2011) (citations and quotation marks omitted).

Grand & Essex Market asserts that the trial court committed reversible error when it failed to allow Grand & Essex Market to offer into evidence the deposition testimony of Mr. Goldklang. Grand & Essex Market's Brief at 8-9. Grand & Essex Market asserts that the deposition testimony was permitted under Pennsylvania Rule of Civil Procedure 4020(a)(3)(b) because Mr. Goldklang, who was located in New Jersey, was located outside the Commonwealth and more than one hundred miles from Washington, Pennsylvania, the place of the trial. *Id.* at 8. Grand & Essex Market further asserted that the deposition testimony was admissible under Pennsylvania Rule of Civil Procedure 4020(d) because it was offered to rebut the portion of Mr. Goldklang's deposition testimony that was read into evidence by QuestMark. *Id.* at 8-9.

The trial court summarized its decision to deny Grand & Essex Market's request to present the deposition of Mr. Goldklang as follows:

At trial, [Grand & Essex Market] attempted to read from the deposition transcript of [Mr. Goldklang, Grand & Essex Market's] corporate designee.  Upon [QuestMark's] objection, [the trial] court sustained the objection finding that no provision of [Rule] 4020 was satisfied to permit the use of the deposition testimony.  [Grand & Essex Market's] counsel offered three reasons why [the deposition testimony should be admitted]: (1) no notice was issued to [Mr. Goldklang] to attend, (2) [Mr. Goldklang is] located outside the Commonwealth, and (3) deposition testimony can be used in rebuttal.  [The trial] court found that [Grand & Essex Market] could have had [Mr. Goldklang] testify, that it wasn't impeachment testimony[,] and that rebuttal testimony would not be proper under the circumstances.  Although [Mr. Goldklang] is located outside of the Commonwealth[,] under [Rule] 4020[(a)](3)(b), deposition testimony is not permitted if "it appears that the absence of the witness was procured by the party offering the deposition."  Further, as mentioned in [QuestMark's] objection, [Grand & Essex Market] did not file a pre-trial statement and[,] therefore[,] no notice that [Grand & Essex Market] intended to use deposition testimony *in lieu* of live testimony was given to [QuestMark].  Therefore, allowing [Grand & Essex Market] to utilize deposition testimony at trial would cause prejudice to [QuestMark.  Grand & Essex Market] provided no valid reason under the Pennsylvania Rules of Civil Procedure to admit deposition testimony of an absent party[.]

Trial Court Opinion, 7/21/25, at 4-5 (footnotes and extraneous capitalization omitted); **see also** N.T., 10/30/24, at 120-126 (detailing the discussion between counsel for both parties and the trial court regarding the admissibility of the deposition testimony).

Pennsylvania Rule of Civil Procedure 4020 states, in pertinent part, as follows:

### Rule 4020.  Use of Depositions at Trial

(a) At the trial, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who

had notice thereof if required, in accordance with any one of the following provisions:

. . .

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds

. . .

(b) that the witness is at a greater distance than one hundred miles from the place of trial or is outside the Commonwealth, unless it appears that the absence of the witness was procured by the party offering the deposition, or

. . .

(d) A party shall not be deemed to make a person his or her own witness for any purpose by taking the person's deposition. The introduction in evidence of the deposition or any part thereof for any purpose other than that of contradicting or impeaching the deponent makes the deponent the witness of the party introducing the deposition, but this shall not apply to the use by an adverse party of a deposition as described in subdivision (a)(2) of this rule. At the trial or hearing any party may rebut any relevant evidence contained in a deposition whether introduced by that party or by any other party.

Pa.R.Civ.P. 4020(a)(3)(b) and (d). Rule 4020 applies to depositions taken for discovery purposes. *Riggi v. Control Constr. Corp.*, 642 A.2d 451, 453 (Pa. 1994). "The proponent of a deposition at trial must demonstrate the unavailability of the witness or the exercise of due diligence on his part in attempting to locate the witness." *Hall v. Owens Corning Fiberglass Corp.*, 779 A.2d 1167, 1171 (Pa. Super. 2001).

Hearsay is defined as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

- 16 -

Pa.R.Evid. 801. "Statements that meet this definition are not admissible, unless the proffered statement falls within an established hearsay exception." *Hagelauer v. Main Line Emergency Med. Assocs., LLC*, 339 A.3d 483, 488 (Pa. Super. 2025); *see also* Pa.R.Evid. 802 (stating, "[h]earsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute"). Pennsylvania Rule of Evidence 804(b)(1) provides an exception to the rule against hearsay for former testimony that "(A) was given [by the declarant] as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had - or, in a civil case, whose predecessor in interest had - an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Pa.R.Evid. 804.

Here, the trial court precluded Grand & Essex Market from reading certain portions of Mr. Goldklang's deposition testimony into the record because the deposition testimony constituted hearsay without an exception and because Grand & Essex Market failed to file a pre-trial statement that stated it anticipated presenting the deposition testimony *in lieu* of live, in-person testimony. N.T., 10/30/24, at 123 (the trial court stating, "I don't see an exception to the hearsay rule"), and 124 (stating, "it's not in any of your documents that you were going to have deposition testimony verses live, in-person testimony). We hold that the trial court erred as a matter of law in finding that the deposition testimony constituted hearsay and was without an exception to allow for its admission. As set forth *supra*, Rule 804(b)(1)

provides an exception to the rule against hearsay for former testimony provided that the declarant was unavailable at the time the party sought to introduce the former testimony and the testimony was given during, *inter alia*, a lawful deposition where the party against whom the testimony was offered had an opportunity and similar motive to question the declarant. **See** Pa.R.Evid. 804(b)(1). Here, Mr. Goldklang was unavailable pursuant to Rule 4020(a)(3)(b) because he was located outside the Commonwealth (as well as more than 100 miles from the place of trial), and there was no inquiry regarding the reason for the witness' absence and no express finding by the trial court at the time the evidence was excluded that the absence of the witness was procured by Grand & Essex Market. **See** Pa.R.Civ.P. 4020(a)(3)(b). Mr. Goldklang's former testimony that Grand & Essex Market sought to introduce at trial was taken during a deposition that was conducted at the request of QuestMark. Therefore, QuestMark had an opportunity to conduct an examination of Mr. Goldklang. As such, the deposition testimony fit squarely within the exception provided by Rule 804(b)(1), and the trial court erred as a matter of law in excluding the testimony on this ground.

Turning to the decision to exclude the deposition testimony on the ground that Grand & Essex Market failed to submit a pre-trial statement that identified the possibility of presenting the deposition testimony *in lieu* of Mr. Goldklang's live, in-person testimony at trial, we hold that the trial court abused its discretion. Pennsylvania Rule of Civil Procedure 212.1 requires a defendant, such as Grand & Essex Market in the case *sub judice*, to file a

pre-trial statement "not later than thirty days prior to the earliest trial date[.]" Pa.R.Civ.P. 212.1(b)(2). A pre-trial statement shall contain, *inter alia*, "a list of the names and addresses of all persons who may be called as witnesses by the party filing the statement, classifying them as liability or damage witnesses." Pa.R.Civ.P. 212.2(a)(3); **see also Wiley v. Snedaker**, 765 A.2d 816, 817-818 (Pa. Super. 2000) (explaining that, "[t]he purpose of a pre-trial statement is to prevent surprise"). If a party fails to file the required pre-trial statement, the trial court, upon a finding that unfair prejudice shall occur, is required to impose a sanction. Pa.R.Civ.P. 212.2(c); **see also Est of Ghaner v. Bindi**, 779 A.2d 585, 589 (Pa. Super. 2001) (stating, "the language of Rule 212.2(c) makes imposition of sanctions mandatory"). Sanctions may, but are not required, to include the preclusion or limitation of testimony or exhibits that were not disclosed in a pre-trial statement. Pa.R.Civ.P. 212.2(c)(1) and (2).

The exclusion of evidence as a sanction for failing to file a pretrial statement, however, "is a drastic remedy and is only appropriate where there is serious prejudice to the opposing party and no reasonable explanation is given for the failure to include the evidence on a pretrial statement." **Lampenfeld v. Seitz**, 676 A.2d 684, 687 (Pa. Super. 1996). As this Court noted previously, "it is clear that in the exercise of judicial discretion in formulating an appropriate sanction order, the [trial] court is required to select a punishment which 'fits the crime.'" **Est. of Ghaner**, 779 A.2d at 590 (citation omitted).

In the case *sub judice*, the trial court directed QuestMark to file its pre-trial statement no later than February 1, 2024, and directed Grand & Essex Market to file its pre-trial statement no later than February 15, 2024. Trial Court Order, 12/12/23. QuestMark filed its pre-trial statement on February 1, 2024, but there is no record that Grand & Essex Market filed a pre-trial statement despite Grand & Essex Market's claim, at trial, that a pre-trial statement was filed.[4] **See generally**, Trial Court Docket; **see also** N.T., 10/30/24, at 125-126 (the trial court stating, "[l]et the record reflect I do not have a pre[-]trial statement from [Grand & Essex Market] that was filed within the file that I'm looking at"). While we do not condone Grand & Essex Market's failure to file a pre-trial statement, or, if filed, to ensure that the document was, in fact, made a part of the record, we find that, under the circumstances of the case *sub judice*, the exclusion of the deposition testimony was too drastic of a sanction and constituted an abuse of discretion.

QuestMark was aware of Mr. Goldklang's deposition testimony because QuestMark was the party who undertook his deposition as part of discovery and QuestMark also read a portion of the deposition testimony into evidence at trial. **See** N.T., 10/30/24, at 109-117. Moreover, it appears, based upon statements made by counsel for QuestMark, that QuestMark received a copy

---

[4] At trial, Grand & Essex Market was unable to provide the trial court with the date on which it filed a pre-trial statement. N.T., 10/30/24, at 126 (counsel for Grand & Essex Market stating, "I don't have my full file with me to verify [the date the pre-trial statement was filed]").

of Grand & Essex Market's pre-trial statement, despite the statement not being made a part of the trial court record. Specifically, counsel for QuestMark stated,

> I'll have to look to see where his pre[-]trial statement is. **It was a very general description.** But even [though] exhibit[s] and [a] witness list [] were required by order of court to [be] identified [in the pre-trial statement, the deposition testimony of Mr. Goldklang] was not identified [in the pre-trial statement] specifically.

N.T., 10/30/24, at 125 (emphasis added). As such, the existence of the deposition testimony by Mr. Goldklang was not a surprise to QuestMark, and QuestMark should not have been surprised that Grand & Essex Market attempted to present the deposition testimony *in lieu* of live, in-person testimony given that the parties did not dispute that Grand & Essex Market, and its corporate designee, were located outside and Commonwealth and Rule 4020 permitted the use of deposition testimony under such circumstances, absent a showing of nefarious actions. There is no evidence of record, nor did the trial court find any such evidence, that demonstrated Grand & Essex Market, by failing to make its pre-trial statement a part of the trial court record, acted in bad faith or engaged in a pattern of willful, dilatory, or obdurate conduct by failing to follow court orders. ***See Lampenfeld***, 676 A.2d at 687 (stating that, evidence may be excluded as a sanction where the party against whom the evidence is offered can show prejudice as a result of the failure to disclose the evidence in a pre-trial statement); ***see also Est. of Ghaner***, 779 A.2d at 590 (finding that, a sanction excluding evidence under

Rule 212.2(c) was drastic where there was "no evidence of repeated failure to comply with the Rules of Civil Procedure or other orders of the trial court"). Therefore, we are constrained to find that the trial court abused its discretion by excluding the admission of the deposition testimony by Grand & Essex Market.[5]

"To constitute reversible error, [however,] an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." **Schuenemann**, 34 A.3d at 101, *citing* **Am. Future Sys., Inc. v. BBB**, 872 A,2d 1202, 1212 (Pa. Super. 2005), *aff'd*, 923 A.2d 389 (Pa. 2007), *cert. denied*, 552 U.S. 1076 (2007). "A party suffers prejudice when the trial court's error could have affected the verdict." **Schuenemann**, 34 A.3d at 101 (citation omitted).

Upon careful review, we find that the trial court's error in excluding the deposition testimony constituted harmless error. At trial, QuestMark read portions of Mr. Goldklang's deposition testimony into evidence as party admissions. These admissions demonstrated, in sum, that the contract did

---

[5] We recognize that, at trial, QuestMark asserted that it did not know what portion of the deposition testimony Grand & Essex Market intended to read into the record. This assertion, however, does not give rise to serious prejudice. QuestMark was well-acquainted with the content of the deposition testimony because QuestMark provided a copy of the deposition testimony to Grand & Essex Market that highlighted the portions of the testimony QuestMark anticipated reading into the record as evidence. In this non-jury trial, a quick recess would have provided Grand & Essex Market the opportunity to identify for QuestMark those portions of the deposition testimony that it intended to read into the record, and QuestMark could have lodged specific objections, thereafter, if necessary.

not require QuestMark to level the floor prior to installing the Tru PC flooring, that the contract did not indicate that the new flooring would be "a uniform color," or that the exposed aggregate would be eliminated. N.T., 10/30/24, at 111-112. Mr. Goldklang, in his deposition testimony, also admitted that "[t]he scope of the work [was] limited to what [was] stated in the proposal and the sales agreement." *Id.* at 115. These admissions were, however, cumulative of the testimony offered by Mr. Wagner, which the trial court found credible, and a plain-reading of the terms set forth in the proposal and sales agreement. Counsel for Grand & Essex Market, in attempting to introduce portions of Mr. Goldklang's deposition testimony into evidence as part of the defendant's case-in-chief, asserted that it sought to admit portions of the deposition testimony "as rebuttal to the deposition testimony which was offered by [QuestMark]." *Id.* at 122; *see also* Grand & Essex Market's Brief at 9 (stating, "[t]he trial court should have permitted rebuttal testimony"). As discussed *supra*, the trial court based its verdict in favor of QuestMark on the testimony of Mr. Wagner and Mr. Altvater, both of whom the trial court found credible. Verdict, 11/6/24.[6] In conducting our review, we found, as discussed

_____

[6] In support of its verdict, the trial court found that

1.   [The trial] court finds that [Mr.] Wagner and [Mr. Altvater] testified credibly as to the existence of a contract between [QuestMark] and Grand & Essex Market for which [QuestMark] was to perform flooring services in exchange for payment.

*supra*, that there was sufficient evidence to support the findings of the trial court and, ultimately, its verdict. Therefore, the admission of the deposition testimony by Grand & Essex Market would not have resulted in a different verdict. As such, while we find that the trial court abused its discretion in excluding the admission of the evidence, this evidentiary ruling constituted harmless error. Consequently, Grand & Essex Market is not entitled to a new trial.

In sum, we find sufficient evidence in the record to support the trial court's findings and verdict that Grand & Essex Market breached the sales agreement by failing to make final payment and that it failed to prove an affirmative defense, namely that QuestMark breached the sales agreement by failing to fulfill its scope of work, as outlined in the sales agreement, in a good and workmanlike manner. We further find that, although the trial court erred in excluding certain deposition testimony offered by Grand & Essex Market, the evidentiary ruling constituted harmless error. Finally, we conclude that, although the trial court erred as a matter of law in awarding interest charges as part of its damage award, we must affirm the judgment because Grand & Essex Market waived this issue.

---

2. [The trial] court also finds the testimony credible that Grand & Essex Market breached the contract by failing to fulfill payment obligations and that there was no defense to such breach.

Verdict, 11/6/24, at Findings ¶¶1 and 2 (extraneous capitalization omitted).

Judgment affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

4/21/2026